[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 26, 2002
THOMAS K. KAHN
CLERK

No. 00-13811

D. C. Docket Nos. 93-01090-CV-ORL-19C
and 94-0976-CV-ORL-19C

NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK),
CSX TRANSPORTATION, INC.,

> Plaintiffs-Cross-Defendants-Counter-Defendants-
> Cross-Appellants-Cross-Appellees,

AMERICAN HOME ASSURANCE COMPANY,
f.u.b.o. Stewart and Stevenson Services, Inc.,

> Plaintiff-Appellant-Cross-Appellee,

versus

ROUNTREE TRANSPORT AND RIGGING, INC.,

> Defendant-Cross-Defendant-Appellee,

KISSIMMEE UTILITY AUTHORITY,

> Defendant-Cross-Claimant-Cross-Defendant-
> Counter-Claimant-Counter-Defendant-
> Third-Party-Plaintiff-Third-Party-Defendant-
> Appellee-Cross-Appellant,

WOKO TRANSPORTATION,
BLACK AND VEATCH, et al.,

> Defendants-Cross-Claimants-Cross-Defendants-
> Counter-Claimants-Counter-Defendants-
> Third Party Plaintiffs-Third-Party-
> Defendants-Appellees,

FLORIDA MUNICIPAL POWER AGENCY,

> Defendant-Cross-Claimant-Cross-Defendant-
> Counter-Claimant-Counter-Defendant-
> Third Party-Plaintiff-Third-Party Defendant-
> Appellee-Cross-Appellant,

GENERAL ELECTRIC COMPANY, INC.,

> Consolidated Defendant-Third-Party Defendant-
> Appellee-Cross-Appellant,

STEWART AND STEVENSON SERVICES, INC.,

> Movant-Cross-Appellant.

_____

AMERICAN HOME ASSURANCE COMPANY,
f.u.b.o. Stewart and Stevenson Services, Inc.,

> Plaintiff-Counter-Defendant-Appellant-
> Cross-Appellee,

versus

NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK),
CSX TRANSPORTATION, INC., et al.,

> Defendants-Appellees-Cross-Appellants,

2

ROUNTREE TRANSPORT AND RIGGING, INC.,

Defendant-Cross-Defendant-Appellee,

KISSIMMEE UTILITY AUTHORITY,

Defendant-Appellee-Cross-Appellant,

FLORIDA MUNICIPAL POWER AGENCY,

Movant-Appellee-Cross-Appellant,

GENERAL ELECTRIC CO.,

Movant-Appellee-Cross-Appellant,

STEWART AND STEVENSON SERVICES, INC.,

Movant-Cross-Appellant.

No. 00-13986

D. C. Docket No. 93-01090-CV-ORL-19C

NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK),
CSX TRANSPORTATION, INC.,

Plaintiffs-Cross-Defendants-Counter-Defendants,

J.E. BEDGOOD, JR.,
LINDA BEDGOOD, et al.,
AMERICAN HOME ASSURANCE COMPANY,
f.u.b.o. Stewart and Stevenson Services, Inc.,

3

Plaintiffs,

versus

ROUNTREE TRANSPORT AND RIGGING, INC.,

Defendant-Cross-Defendant-Appellee,

KISSIMMEE UTILITY AUTHORITY,

Defendant-Cross-Claimant-Cross-Defendant-Counter-Claimant-Counter-Defendant-Third-Party-Plaintiff-Third-Party-Defendant,

WOKO TRANSPORTATION,

Defendant-Cross-Claimant-Cross-Defendant-Counter-Claimant-Counter-Defendant-Third-Party-Plaintiff-Third-Party-Defendant,

BLACK AND VEATCH, et al.,

Defendant-Cross-Claimant-Cross-Defendant-Counter-Claimant-Counter-Defendant-Third-Party-Plaintiff-Third-Party-Defendant-Appellant,

FLORIDA MUNICIPAL POWER AGENCY,

Defendant-Cross-Claimants-Cross-Defendants-Counter-Claimant-Counter-Defendant-Third-Party-Plaintiff-Third-Party-Defendant,

GENERAL ELECTRIC CO.,

Third-Party-Defendant-Appellee.

_____

4

Appeals from the United States District Court
for the Middle District of Florida

_____

**(March 26, 2002)**

Before TJOFLAT and BIRCH, Circuit Judges, and GOLDBERG*, Judge.

BIRCH, Circuit Judge:

These consolidated appeals arise from the district court's final judgment resolving a series of cases that were filed after a passenger train of the National Railroad Passenger Corporation ("Amtrak"), as it moved on the railroad track of CSX Transportation, Inc. ("CSX"), collided with a hauler rig owned by Rountree Transport and Rigging, Inc. ("Rountree"). The Rountree vehicle had become immobilized on a railroad crossing as it attempted to transport a combustion turbine and a turbine enclosure to a power plant of the Kissimmee Utility Authority ("KUA") near Kissimmee, Florida. American Home Assurance Corporation ("AHA"), subrogee of Stewart and Stevenson Services, Inc. ("S&S"), commenced these appeals to challenge several district court rulings that affected its entitlement to damages flowing from the collision. The issues in this aspect of the appeal include: (1) the propriety of excluding certain evidence offered by AHA to prove

_____

*Honorable Richard W. Goldberg, Judge, U.S. Court of International Trade, sitting by designation.

5

its damages; (2) whether transport of the combustion turbine properly was deemed an inherently dangerous work activity; (3) the propriety of reducing AHA's damages under the Florida comparative fault statute; and (4) whether AHA should have been denied prejudgment interest on its damages. We AFFIRM the district court's rulings with regard to the first, second, and fourth issues. The third issue, however, raises unsettled questions of state law which we certify to the Florida Supreme Court for resolution.

In addition to AHA's appeal, KUA, Florida Municipal Power Agency ("FMPA"), and Black & Veatch ("B&V") have appealed the decision by the district court that General Electric Company ("GE") did not have to defend and indemnify them for the collision. We AFFIRM the district court's decision. KUA and FMPA also have appealed the district court's decision requiring them to defend and indemnify CSX and Amtrak. Within this latter appeal, KUA and FMPA have raised the issue of whether state law sovereign immunity shields them from being required to defend and indemnify CSX and Amtrak. Because the sovereign immunity issue involves unsettled questions of state law, we certify the issue to the Florida Supreme Court for review. In sum, we have decided that with respect to these consolidated appeals, we AFFIRM in part but STAY all further proceedings, pending the Florida Supreme Court's resolution of our certified

questions.

## I. BACKGROUND

A. <u>Construction of the Cane Island Power Plant</u>

KUA is an municipal agency created by the city of Kissimmee, Florida, to construct, operate, and manage the city's municipal electrical utility systems. As part of its charge, KUA oversaw the construction of the electrical facility known as the Cane Island Power Plant (the "Plant") near Kissimmee, Florida. To effectuate the construction, KUA contracted with B&V, who agreed to serve as project engineer. KUA also entered into a Participation Agreement with FMPA, a joint-action agency organized under Florida law with authority to undertake and finance electric projects. By entering into the Participation Agreement, FMPA acquired a 50% ownership interest in the Plant and agreed to share with KUA the production costs of electricity.

In overseeing the construction, KUA took steps to ensure that there would be vehicular and pedestrian access to the Plant. Accordingly, KUA entered into a Private Road Grade Crossing Agreement (the "Crossing Agreement") with CSX, who granted the utility a license to construct, use, and maintain a private road grade crossing over CSX's railroad tracks. In return for the license, KUA was required under the Crossing Agreement to "defend, indemnify, protect and save

7

[CSX] harmless from and against [designated losses and casualties]." R53-1172 Exh. A at 14.2. The Crossing Agreement further mandated that KUA defend and indemnify any company whose property was "operated" by CSX at the railroad crossing. Id. at 1.2.

In its oversight role, KUA also contracted with GE for purchase and delivery of certain customized power generation equipment, including a combustion turbine. KUA and GE entered into a Turbine Purchasing Agreement (the "Purchasing Agreement"), which included an indemnification provision under which GE promised to defend and indemnify KUA, its agents, and B&V "to the extent of and on account of any negligent act or omission of [GE] in performing the work under the Contract." R104-2060 Exh. A at GC.29.

Upon entering into the Purchasing Agreement, GE contracted with S&S, who agreed to purchase and then customize the equipment that would be delivered to the Plant. In turn, S&S contracted with a "transportation broker," WOKO Transportation ("WOKO"), who arranged for transport of the customized turbine equipment. WOKO contracted with Rountree to have certain pieces of the customized equipment — the combustion turbine and an enclosure for housing it — transported to the Plant on 30 November 1993. The combustion turbine and its enclosure made up only one out of forty-five boxes of customized turbine

equipment transported to the Plant. Not included in the November shipment were boxes 2-45, which contained additional equipment customized by S&S, including, among other things, an air filter, turbine generator controls, a control house, and lube oil cooler fans.

B. The Collision

Because the combustion turbine weighed 82 tons, Rountree transported the turbine and its enclosure by using a road tractor that pulled a hauler rig. The height of the hauler rig could be adjusted to deal with gradations in the terrain. The underlying casualty occurred on 30 November 1993 as Rountree, while transporting the combustion turbine and its enclosure to the Plant, attempted to adjust the height of the rig at the railroad crossing licensed to KUA from CSX. The railroad tracks at the crossing were on an elevated grade. As the hauler rig was driven onto the crossing, the hauler crew realized that the rig would be unable to negotiate the elevated terrain without its height first being adjusted. The crew adjusted the height of the rig without first removing the rig from the railroad tracks. Before the rig was removed from the tracks, an Amtrak passenger train collided with it. The collision destroyed the rig, the combustion turbine, and the turbine enclosure. The Amtrak train also was damaged, and some of the passengers and train crew suffered personal injuries.

9

C.  The Lawsuits

Multiple lawsuits were filed against various parties and their insurers seeking to establish responsibility for the collision.   CSX and Amtrak (collectively, the "Rail Companies") brought suit against, among others, B&V, Rountree, and KUA.  The Rail Companies raised several claims, including that the crossing had been improperly designed and constructed by B&V, and that Rountree and KUA were negligent in the transport of the combustion turbine and its enclosure.  They further claimed that, by virtue of the Crossing Agreement, KUA was obligated to defend and indemnify them.

Additionally, numerous passengers and crew members who were aboard the Amtrak train at the time of the collision sued for personal injuries and property damage.  Later, AHA, as subrogee of S&S, commenced suit against several entities, including the Rail Companies, Rountree, B&V, KUA, and FMPA, after it compensated its insured, S&S, for loss of the combustion turbine and the turbine enclosure.  AHA claimed that the negligence of the defendants collectively caused S&S to sustain the loss which was covered by its insurance policy with AHA.  In turn, as part of the AHA litigation, KUA brought a third-party complaint against GE claiming that the Purchasing Agreement required GE to defend and indemnify KUA.

10

D.  Procedural History

The various cases were consolidated, and the district court bifurcated the proceedings into a liability phase and a damages phase.  During the former phase, the Rail Companies moved for summary judgment on the indemnification issue.  They asked the court to rule as a matter of law that KUA had to defend and indemnify them as a result of the Crossing Agreement.  The court granted summary judgment in favor of CSX but denied the motion by Amtrak.  The court concluded that Amtrak's claim for indemnity involved factual issues that had not yet been resolved.[1]

A three-week jury trial subsequently was held in 1996 on the liability issue for all claimants and all defendants in the consolidated cases.  On the same day as the jury rendered its verdict, the district court granted judgment as a matter of law to S&S and GE, holding that they were free of direct negligence for the collision.  The jury, in turn, absolved all parties of direct negligence except for Rountree, CSX, and Amtrak.  The jury determined that Rountree was 59% at fault for the collision, CSX was 33% at fault, and Amtrak was 8% at fault.  The district court

---

[1]After the district court issued its order, KUA filed an interlocutory appeal with our Court.  KUA argued that the district court erred in granting summary judgment to CSX because it was entitled to sovereign immunity under Florida law.  We held that we lacked jurisdiction to resolve an appeal based on issues of state law sovereign immunity because the matter was not final and because such issues were not entitled to interlocutory review.  CSX Transp., Inc. v. Kissimmee Util. Auth., 153 F.3d 1283, 1286 (11th Cir. 1998).

11

then issued orders that damages trials would be held for all plaintiffs, starting with the personal injury plaintiffs, then with the Rail Companies, and finally with AHA. Additionally, the court granted B&V's motion for a ruling that transportation of the combustion turbine was inherently dangerous as a matter of law. The court further held that, as a result of the inherent dangerousness in transporting the combustion turbine, WOKO, S&S, and GE were vicariously liable for Rountree's negligence.

Before a jury trial on damages ensued, B&V, KUA, and FMPA moved for summary judgment against GE. They alleged that, under the indemnification provision contained in the Purchasing Agreement, GE had to reimburse them for the expenses they incurred as a result of successfully defending themselves in the turbine litigation. The district court denied the motions and ruled that the losses suffered by the three parties were not within the scope of the indemnification provision. Also before the damages trial, the court reconsidered the issue of whether KUA had to defend and indemnify Amtrak under the Crossing Agreement. Having reconsidered the issue, the district court granted Amtrak's renewed motion for summary judgment and ruled as a matter of law that KUA was contractually obligated to defend and indemnify Amtrak. In addition to its other decisions, the court granted Rountree's motion for a ruling as a matter of law that its liability to AHA was limited to $1,000,000.

Then, in December 1999, the district court oversaw a jury trial on the issue of AHA's damages. By the time of the damages trial, the Rail Companies had settled their claims with all other parties. Indeed, all parties in the various consolidated cases had settled their damages claims by that time, except for AHA as subrogee of S&S. At the damages trial, AHA wanted to prove the amount of damages incurred by S&S by using the formula that its personnel had employed in adjusting the insurance claim of S&S. Under this formula, the loss to S&S was measured by taking the total value of all the customized turbine equipment contained in boxes 1-45 and then subtracting the value of the equipment contained in boxes 2-45, equipment that was undamaged because boxes 2-45 were never on the Rountree hauler. Pursuant to its valuation method, AHA tried to substantiate the value of the customized equipment contained in boxes 2-45 through invoices and witness testimony. AHA also sought to introduce certain documentary evidence and witness testimony concerning both how it arrived at the monetary figures in its insurance valuation and how much it paid out to S&S. The district court refused to admit any of this documentary and testimonial evidence.

After AHA rested its case-in-chief, several parties orally moved for the district court to direct a verdict as to the amount of proven damages. They maintained that the court should enter judgment in favor of AHA and against

13

Rountree, CSX, and Amtrak in the amount of $1,851,822.40, which represented 41% of the damages they argued AHA had proven ($4,546,640). Orally granting the motion, the court ruled that AHA, standing in the shoes of S&S, had proven that S&S had incurred $4,546,640 in damages, only 41% of which AHA was entitled to recover. The district court previously had ruled that S&S was vicariously liable for Rountree's negligence based on the inherent dangerousness of transporting the combustion turbine. The court reasoned that, just as Rountree could collect only 41% of its damages under Florida comparative fault principles, the vicariously liable S&S (and hence AHA) could collect only 41% of the damages incurred by S&S. Having reduced AHA's damages, the court then denied AHA's request for prejudgment interest on its damages award. Since the district court already had held that Rountree's liability to AHA was limited to $1,000,000, the court proceeded to enter final judgment against the Rail Companies jointly and severally for the remaining $851,822.40.

Upon entry of final judgment,[2] the turbine litigation, a train wreck in its own

[2]The parties initially appealed from the final judgment issued by the district court on 15 June 2000. FMPA, however, moved to dismiss and remand because the district court had failed to dispose of AHA's post-judgment motion to alter or amend the judgment or for a new trial filed pursuant to Federal Rule of Civil Procedure 59. As a consequence, we ordered that the appeal be held in abeyance pending the district court's resolution of the Rule 59 motion. Thereafter, the district court signed a memorandum order disposing of the Rule 59 motion, and on 4 October 2000 the court issued an amended final judgment from which the parties now appeal.

14

right, came crashing into our court. AHA commenced appeal to seek review of several rulings made by the district court during the damages trial. On appeal, AHA argues that the district court erred in restricting the evidence it could introduce to prove the amount of its damages. AHA also asserts that the court erroneously concluded that transport of the combustion turbine was inherently dangerous as a matter of Florida law,[3] a ruling that led the court to impute Rountree's negligence to S&S (and thus to AHA) for damages purposes. Moreover, AHA contends that even if S&S properly was imputed with Rountree's negligence, the district court erred in applying Florida comparative fault principles to limit AHA, as subrogee of S&S, to recovering 41% of S&S's proven damages. Finally, AHA contends that the court mistakenly refused to grant prejudgment interest on its damages award.

In addition to the appeal over AHA's damages, KUA, FMPA, and B&V have commenced appeals against GE on the issue of contractual indemnification. They argue that the district court erred in holding that, under the indemnification provision in the Purchasing Agreement, GE did not have to reimburse them for the expenses they incurred in defending themselves. They maintain that the

---

[3]S&S, GE, and Rountree also seek review of the district court's ruling that transport of the combustion turbine was inherently dangerous.

15

indemnification provision is applicable here because they had to defend themselves against claims resulting from the turbine collision that arose out of GE's failure to have the turbine transported safely.

Finally, KUA and FMPA have commenced cross appeals against the Rail Companies. They seek review of the district court's grant of summary judgment to CSX and Amtrak on the issue of contractual indemnification. They assert that, for several reasons, the court erroneously concluded that KUA — and by extension, FMPA[4] — had to defend and indemnify the Rail Companies under the indemnification provision in the Crossing Agreement. KUA and FMPA claim that the indemnification provision is unenforceable based on Florida sovereign

---

[4]In its first order related to the indemnity issue, the district court ruled that KUA had to defend and indemnify CSX. In a later order, the court ruled that KUA had to defend and indemnify Amtrak. In neither of these orders did the court refer to FMPA.

The Rail Companies originally sued only KUA for contractual indemnity. FMPA subsequently filed a motion to be added as an additional defendent with regard to the indemnification claim brought by the Rail Companies against KUA. FMPA requested that it be added as a defendant because, under its Participation Agreement with KUA, FMPA was required to pay 50% of any sums that KUA paid out as a consequence of the turbine litigation. The district court granted FMPA's motion, and after its joinder as a defendant, FMPA actively litigated and opposed the indemnity claims against KUA in its own name.

In its amended final judgment, the district court stated that in its two summary judgment orders regarding the indemnity issue, it had ruled that both KUA and FMPA had to defend and indemnify the Rail Companies. This is technically incorrect because only KUA is mentioned in those orders. But when the summary judgment orders are read in conjunction with the court's order concerning joinder of FMPA, and in conjunction with the terms of the Participation Agreement, the amended final judgment is reflective of the net effect of all these rulings, namely, that FMPA (along with KUA) is required to defend and indemnify the Rail Companies.

16

immunity law. They also raise several alternative arguments as to why they should not have to defend and indemnify the Rail Companies. For instance, KUA and FMPA argue that the indemnification provision is unenforceable because the special requirements under Florida law for indemnification in "construction" contracts have not been met. The provision also is unenforceable, they contend, based on Florida law dealing with exculpatory, or adhesion, contracts. Indeed, the indemnification provision is not applicable to the present case, KUA and FMPA maintain, because the negligent actions of CSX occurred in a location separate and apart from the railroad crossing. Finally, they assert that, even if the provision is enforceable and applicable to the facts here, Amtrak was not covered by the provision.

## II. DISCUSSION

A. <u>AHA's Damages</u>

In addressing the plethora of issues raised on appeal, we turn first to those raised by AHA. AHA's appeal focuses on several decisions made by the district court, including: (1) the decision to exclude AHA's damages evidence and to direct a verdict on the amount of damages; (2) the decision that transport of the combustion turbine was inherently dangerous as a matter of Florida law; (3) the decision that Florida comparative fault principles limited AHA to recovering 41%

of its damages; and (4) the decision not to grant AHA prejudgment interest on its damages. We will address each decision in turn.

1. Evidentiary Rulings

The evidentiary rulings at issue occurred as the district court oversaw the damages trial at which AHA, as subrogee of S&S, sought to prove the damages incurred by S&S as a result of the collision. Prior to the collision, S&S bought certain turbine equipment, such as the turbine engine, which it then customized by adding wiring assemblies, harnesses, and piping. It also built an enclosure for housing the turbine equipment. S&S sold the customized equipment to GE, who then resold the equipment to KUA for use at the Plant.

So that Rountree could transport the customized equipment to the Plant, S&S sorted the items of equipment into forty-five separate boxes, which were shipped at different times. Box 1 contained the combustion turbine and its enclosure. Boxes 2-45 contained other equipment, including air filters, turbine generator controls, a control house, and a ventilation module. Only box 1 was on the Rountree hauler rig, and only box 1 was damaged in the collision. As a result of the damage from the collision, S&S sold the turbine engine as scrap to GE for $130,000. S&S subsequently filed an insurance claim with AHA, who paid out $8,695,300 in proceeds to S&S.

18

At the damages trial, AHA's theory of damages was predicated on the formula its personnel had used to adjust the insurance claim of S&S after the collision. Under this insurance valuation formula, AHA did not measure the loss to S&S by taking the value of the customized turbine equipment in box 1 before the collision and subtracting the value of what was left of the equipment after the collision. Rather, AHA measured the loss to S&S by taking the total value of all the customized turbine equipment contained in boxes 1-45 before the collision and then subtracting the value of the equipment contained in boxes 2-45, equipment that went undamaged because it was shipped separately and thus was not on the Rountree hauler rig.

To prove its damages under this formula, AHA attempted to admit into evidence a list of invoice prices for the equipment contained in boxes 2-45, which it argued represented the "salvage value"[5] of the turbine equipment not destroyed by the collision. The district court refused to admit this evidence. The court, moreover, prevented several witnesses from testifying about the way in which the loss to S&S was calculated for the insurance valuation. The court excluded

---

[5]Both during the damages trial and on appeal, AHA has referred to the value of the undamaged equipment in boxes 2-45 as "salvage value." The use of this terminology only sows confusion. The undamaged equipment in boxes 2-45 was not salvaged from the scene of the collision because it was never present at the collision. The only salvage in this case was the equipment contained in box 1 that was retrieved from the accident and that retained some value even after it was damaged.

19

testimony from Dianne Furgerson, the claims adjuster for the collision, who would have testified about the proof of loss form submitted by S&S. She also would have testified about the subrogation receipts that showed the amount of insurance proceeds paid to S&S in settlement of its insurance claim. Additionally, the court excluded testimony from Carl Shook, a project manager for S&S, and Dean Summers, a S&S corporate risk manager. They would have testified as to how S&S calculated its loss under the insurance policy.

The district court excluded the aforementioned evidence under Federal Rule of Evidence 401 as irrelevant and under Rule 403 as confusing to the jury. The court excluded AHA's evidence because it rejected the insurer's formula for calculating damages. In the district court's view, AHA was limited to proving the loss in value of the customized turbine equipment contained in box 1 (the combustion turbine and its enclosure), the only box involved in the collision. The court saw no basis for permitting AHA to expand the evidence it presented to include proof as to the value of the undamaged equipment shipped separately in boxes 2-45.

The district court, however, did permit the introduction of evidence concerning the value of the combustion turbine engine because it was shipped in box 1. The court allowed into evidence the invoice for the original sale of the

engine to S&S for $4,646,640.[6]  The court also allowed in evidence that S&S sold

the damaged engine for scrap to GE for $130,000.  Based on the invoice and scrap

price, the district court granted judgment as a matter of law as to the amount of

damages AHA had proven, which the court calculated as $4,546,640 ($4,646,640 -

$130,000).[7]

In evaluating the district court's decisions concerning the relevancy of

certain evidence of damages, we reverse only if the court abused its discretion.

Pesaplastic, C.A. v. Cincinnati Milacron Co., 750 F.2d 1516, 1524 (11th Cir.

1985).  As to the district court's grant of judgment as a matter of law on the

amount of damages, our review is de novo, and we treat the evidence presented to

the jury in the light most favorable to the nonmoving party.  Willingham v.

Loughnan, 261 F.3d 1178, 1180 (11th Cir. 2001).  We turn now to the Florida law

that will guide us in assessing the aforementioned rulings by the district court.

In Florida, "[t]he objective in calculating the proper measure of damages is

to place the plaintiff in the same financial position as that occupied before the

property was damaged."  Ocean Elec. Co. v. Hughes Labs., Inc., 636 So. 2d 112,

---

[6]AHA never introduced invoices or other documentation showing the costs it incurred in obtaining and customizing the other equipment in box 1.

[7]Having ruled that AHA had proven damages in the amount of $4,546,640, the court reduced the proven damages by 41% to $1,851,822.40.  This reduction in damages is discussed infra at sections II.A.2 & 3.

21

114 (Fla. Dist. Ct. App. 1994). A party whose chattel is harmed "is entitled to the difference between the value before and after the damage." Hillside Van Lines, Inc. v. Matalon, 297 So. 2d 848, 848 (Fla. Dist. Ct. App. 1974) (per curiam); see also American Equity Ins. Co. v. Van Ginhoven, 788 So. 2d 388, 391 (Fla. Dist. Ct. App. 2001). Courts, however, must be careful to ensure that the party who incurred the loss is not unjustly enriched by the damages award. Ocean Elec., 636 So. 2d at 114.

Applying these principles to this case, we rule that the district court was correct in its exclusion of AHA's damages evidence. The evidence that AHA sought to introduce was meant to substantiate the damages figure arrived at by AHA in adjusting the insurance claim of S&S. It follows that, if the formula used by AHA to adjust the claim was an improper measure of damages under Florida law, the admission of evidence offered to substantiate the damages figure calculated under that formula would similarly be improper. Because we conclude that AHA's insurance valuation formula constitutes an improper measure of damages, we likewise conclude that the district court correctly excluded evidence offered to substantiate that valuation.

As we have explained, AHA's insurance valuation formula was based on the value before the collision of all the customized turbine equipment contained in

22

boxes 1-45, minus the value after the collision of the equipment contained in boxes 2-45, equipment that was shipped separately, was not on the Rountree hauler, and was not involved in the collision. There is no authority under Florida law for calculating damages in this manner. Rather, Florida law indicates that the basic measure of damages for loss to chattels is the difference between the value of the damaged property before and after the casualty. American Equity Ins. Co. v. Van Ginhoven, 788 So. 2d at 391; Hillside, 297 So. 2d at 848. The focus thus is on the property actually involved in the casualty and the resulting loss in its value caused by any damage it sustained.

AHA did not properly constrain its focus. Instead of focusing narrowly on the loss in value to the combustion turbine and its enclosure in box 1, AHA chose to measure its damages by incorporating the value of equipment contained in boxes 2-45. There could be no "difference between the value before and after the damage" with regard to such equipment, however, because it was not involved in the underlying casualty in the first place. Hillside, 297 So. 2d at 848. Consequently, AHA's damages formula, and the evidence it tried to introduce in support thereof, are inconsistent with Florida law.

AHA argues in rebuttal that the equipment contained in the forty-five boxes constituted one item of merchandise that had been disassembled into separate

23

boxes for transport to the Plant. AHA points out that all of the customized equipment was sold to GE by S&S as part of one sales contract. Moreover, AHA claims that the two contracting parties, in the purchase invoice and otherwise, treated the equipment as one LM 6000 turbine unit. In this manner, AHA argues that the proper measure of damages is the value before the collision of the LM 6000 turbine unit (boxes 1-45) minus its value after the collision (boxes 2-45).

We disagree. This is not a contracts action, and the terminology of the sales contract between S&S and GE is not determinative with regard to third party tortfeasors like the Rail Companies or Rountree. AHA, moreover, cannot avoid the fact that separate items of turbine equipment were contained in boxes 1-45, and that only a distinct set of those items was involved in the underlying casualty. The distinct set of items in box 1 had an independent market value that readily could be ascertained, and so there was no good reason to complicate and confuse matters by including boxes 2-45 in the damages calculation.

AHA's argument would carry more weight if the separate items of turbine equipment were so interdependent that the value of any one item could not be ascertained without reference to the others. That is, AHA's position would have merit if the value of the combustion turbine and the enclosure in box 1 was so intertwined with the value of the other equipment in boxes 2-45 that it could not be

24

separately adduced. But that is not the case here. The record, for example, demonstrates that the value of the combustion turbine engine in box 1 could be ascertained both before and after the accident through a purchase invoice and through testimony regarding the scrap sale of the damaged engine. As a result, we reject AHA's attempt to treat boxes 1-45 as a single item of merchandise for damages purposes.

We also note that, even if we agreed with AHA's treatment of all forty-five boxes as a single item of merchandise, its theory of damages still would be fundamentally flawed. In calculating the market value of the turbine equipment in boxes 1-45 before the collision, AHA relied on the "declared value" of that equipment under its insurance policy with S&S. The declared value of the forty-five boxes of equipment was $12,513,270, and this figure, in turn, was calculated in part by factoring in the price at which S&S sold the customized equipment to GE, $12,219,213.

The proper measure of market value "is dependent upon the choice of the appropriate economic market which will achieve the objective of making the injured party whole, while avoiding any unjust enrichment." Ocean Elec., 636 So. 2d at 114. Because AHA's insurance valuation relied in part on the price GE paid S&S for the customized turbine equipment, AHA's damages figure contained a

profit component.[8]  Inclusion of this component, however, would unjustly enrich

S&S, and hence AHA.  After the collision, S&S customized a new combustion

turbine and turbine enclosure for the Plant and sold these replacement items to GE.

S&S thus was able to obtain its profit on the sale of the turbine and its enclosure.

To allow AHA to predicate its damages on a figure that includes such profits

---

[8]We recognize that AHA's insurance valuation purported to subtract out S&S's profit component for the equipment in boxes 2-45.  But AHA has not explained how the profit figure was generated.  Even Dean Summers, the S&S corporate risk manager, indicated in his proffered deposition that he was unsure about the figure:

> Q.  In your letter here you say, "I am still visiting with various individuals who may be able to shed more light on how profits are figured."  Who were you visiting in that regard?
> A.  [Dean Summers:] Probably Carl [Shook], probably Rick Stewart, other people at Jacinto Port.
> Q.  And what did they tell you in terms of how much profit is in the main unit as opposed to the auxiliary units?
> A.  I'm not sure they really told me anything as far as profit.  I don't have a recollection of knowing what the profit was on the unit, whether it be as a whole or whether it be salvage value, except what was stated here.  And I couldn't tell you how that number was arrived at.  That number was acceptable to us, [as] it was acceptable to . . . American Home.
> Q.  Well, I understand it may be acceptable to both of you, but my question is what is the basis for arriving at it?
> A.  I couldn't tell you.
>> Mr. Karcher: Objection.  Which number are you talking about now?
>> Mr. Roper: I was referring, and I think the witness was referring to the profit figure on the undamaged items.
>> Mr. Karcher: Oh, okay.
> Q.  (By Mr. Roper): Is that correct?
> A.  Yes, sir.

Summers Dep. at 53-54 (November 5, 1999) (proffered at R138-34).  It is therefore unclear whether AHA employed a valuation methodology that reliably extricated all of S&S's profits with regard to boxes 2-45.  In addition, and more importantly, there is no evidence that AHA attempted to subtract out the profit component from its insurance valuation for the equipment contained in box 1, the box most central to this case.

26

would permit the insurer "to recover lost profits that were *never lost* in the first place." Ocean Elec., 636 So. 2d at 115 (quotations omitted).[9]

Furthermore, AHA would be unjustly enriched even more than our analysis at first suggests because, even if the profit component were extracted from the declared value, the declared value still would not reflect the actual loss incurred by S&S. Indeed, Dianne Furgerson, the claims adjuster, stated in her proffered deposition testimony that the AHA insurance policy was not geared towards compensating S&S for the actual cash value of the equipment that was damaged, but was instead predicated on the invoice sales price, plus a 5% markup.[10] Thus,

---

[9]AHA seeks to justify its damages calculation, which includes a profit component, by relying on the actual loss rule under 49 U.S.C. § 11707. Section 11707, however, is applicable only to common carriers under the Interstate Commerce Act. AHA has presented no evidence that any of the parties are subject to the Act. Even if AHA was correct and § 11707 applies, an exception to the actual loss rule exists where the shipper or manufacturer can replace a shipment at cost and suffers no loss of profit. Philips Consumer Elecs. Co. v. Arrow Carrier Corp., 785 F. Supp. 436, 441 (S.D. N.Y. 1992). Because S&S eventually fulfilled its contract with a replacement combustion turbine and turbine enclosure and thus did not lose its profit on the contract, the actual loss rule does not apply, and the proper measure of damages under the Interstate Commerce Act would be the replacement cost of the damaged goods. Oak Hall Cap & Gown Co. v. Old Dominion Freight Line, Inc., 899 F.2d 291, 296 (4th Cir. 1990).

[10]Q. So your policy is not geared at all to compensating the insured for the actual cash value of the loss, is that what you're saying?
A. [Dianne Furgerson:] Correct. We pay [an] insured amount.
Furgerson Dep. at 32 (November 5, 1999) (proffered and read into record at R138-18-19). Furgerson later indicated that the insured amount, or the declared value, was premised on the invoice sales price plus the 5% markup:
Q. That declared value, as I understand it, is a function of the invoice price plus a 5 percent add-on or markup, correct?
A. Correct.
Id. at 34 (proffered at R138-18).

the insurance policy calculated the amount paid to S&S in insurance proceeds not only by factoring in the purported value of the equipment based on the invoice sales price, which included a profit component, but also by including a 5% increase to that amount.

The 5% markup was not based on any actual costs substantiated by S&S. The increase, in fact, was a generic, fixed percentage that AHA had agreed to as part of the insurance coverage.[11] The inflated value attributed to the equipment as a result of the 5% increase would lead, in turn, to the insurance formula overstating the losses incurred by S&S when the equipment was damaged. As we have noted, Florida law requires that courts ensure that the damages awarded for loss to chattel do not unjustly enrich the injured party. Ocean Elec., 636 So. 2d at 114. Accordingly, we rule that an insured party whose property has been damaged cannot force a third-party tortfeasor to pay out in damages a negotiated figure between insurer and insured that reflects contract terms that inflate the value of the

---

[11]In her proffered deposition testimony, Furgerson stated that the 5% markup was "standard" in such insurance policies and that the percentage increase was factored in regardless of whether the insured "had any additional charges or not." Furgerson Dep. at 35 (proffered at R138-18). She also noted that S&S never demonstrated that it had incurred any additional costs that would justify the 5% increase:
Q. Did Stewart & Stevenson ever provide you with any documentation that they had, in fact, incurred a 5 percent additional cost as a result of this accident?
A. No. They are not required to.
Id. at 35.

28

property.  In sum, the contractual 5% markup that was factored into the declared value of the equipment in the insurance policy skews AHA's damages theory, because, like the inclusion of the profit component, it raises the specter of unjust enrichment.

Based on the foregoing analysis, we hold that the district court did not abuse its discretion in excluding AHA's damages evidence.  AHA's evidence concerning the insurance valuation of the turbine equipment contained in boxes 2-45 was irrelevant to a proper determination of S&S's actual damages, given that only the equipment in box 1 was involved in the collision.   Such evidence would have confused the jury, who likely would have lost focus as to which equipment was actually on the Rountree hauler.  AHA's evidence regarding the insurance valuation of the damaged turbine equipment in box 1 also was irrelevant because, by including a profit component and a generic 5% markup, it did not reflect the loss that S&S actually sustained.

It follows that the district court did not err in granting judgment as a matter of law in the amount of $4,546,640.  The only relevant evidence concerning the value before and after the collision of the equipment in box 1 was the invoice representing the price of the turbine engine sold to S&S for $4,646,640, and the evidence concerning the scrap price of the damaged turbine sold to GE by S&S for

29

$130,000.  AHA failed to introduce any other witnesses or documentary evidence that demonstrated the costs incurred by S&S in obtaining and customizing the other equipment in box 1.  AHA could have gathered this information and presented it at trial had it chosen to do so.[12]  Accordingly, the district court was correct to hold as a matter of law that AHA had proven damages totaling $4,546,640.

   2.  The Inherently Dangerous Work Doctrine

      a.  The Inherent Dangerousness Issue

Having held as a matter of law that AHA had proven damages totaling $4,546,640, the district court limited AHA to recovering 41% of its damages award.  The court reduced AHA's damages based on its earlier ruling that transport of the combustion turbine was inherently dangerous as a matter of Florida law. Based on its ruling that transport of the combustion turbine was inherently

---

[12] For example, with regard to the turbine enclosure in box 1, Shook, the S&S project manager, testified to the following:
> Q.  AND AS YOU TOLD THE JURY YESTERDAY, YOU DO NOT KNOW AND CANNOT TELL US HOW MUCH IT COST STEWART & STEVENSON TO MANUFACTURE THE TURBINE ENCLOSURE, IS THAT CORRECT, SIR?
> A. [Carl Shook:] I DID NOT PUT ANY COST TOGETHER TO REPRESENT WHAT THE BALANCE OF THAT PACKAGE WOULD BE, THAT'S CORRECT.
> Q.  AND BACK IN 1994, IF YOU HAD BEEN ASKED TO PUT TOGETHER THE COST OF WHAT IT WAS IN THE BOX ENCLOSURE, YOU COULD HAVE DONE THAT?
> A.  YES, WE COULD.

R138-45.

30

dangerous, the court had held that S&S, GE, and WOKO were vicariously liable for Rountree's negligent transport of the turbine. Had S&S not been held vicariously liable, Rountree's negligence (59%) would not have been imputed to S&S, and hence to AHA as subrogee of S&S.[13] The imputation of Rountree's negligence to S&S, and thus to AHA, led the court to limit AHA's recovery to 41% of the proven damages based on comparative fault principles.

On appeal, AHA, as well as S&S, GE, and Rountree (collectively, the "I.D. Appellants"),[14] challenge the district court's decision that transport of the combustion turbine constituted inherently dangerous work as a matter of Florida law. We review de novo a ruling on a matter of law by the district court. Willingham, 261 F.3d at 1180. We take the evidence presented in the light most favorable to the nonmoving party. Id.

Under Florida law, an owner, contractor, or employer is not liable for injury caused by an independent contractor's negligence, unless the owner, contractor, or employer's own active negligence caused or contributed to the injury. Baxley v.

_____

[13]AHA does not dispute that, as subrogee of S&S, it steps in the shoes of S&S, the subrogor. See Underwriters at Lloyds v. Lauderdale Lakes, 382 So. 2d 702, 704 (Fla. 1980).

[14]It is true that the Florida Supreme Court's answer to our certified question in section II.A.3 may be dispositive of whether *AHA's* damages properly were reduced by 41%. Nevertheless, we proceed to address the inherent dangerousness issue because several parties have challenged the ruling of the district court. It follows that our decision on the issue will not become moot, regardless of how the Florida Supreme Court answers the certified question.

31

<u>Dixie Land & Timber Co.</u>, 521 So. 2d 170, 172 (Fla. Dist. Ct. App. 1988). An exception to this rule is the inherently dangerous work doctrine, which applies when the work to be performed by the independent contractor "is inherently or intrinsically dangerous." <u>Florida Power & Light Co. v. Price</u>, 170 So. 2d 293, 295 (Fla. 1964) (per curiam). An activity is inherently dangerous if the "danger *inheres in the performance of the work*," and "it is sufficient if there is a recognizable and substantial danger inherent in the work, even though a major hazard is not involved." <u>Id.</u> The activity, moreover, must be such that "in the ordinary course of events its performance would probably, and not merely possibly, cause injury if proper precautions were not taken." <u>Id.</u> If the activity is found to be inherently dangerous, then the "one engaged in or responsible for the performance of [the] work . . . is said to be under a nondelegable duty to perform, or have others perform, the work in a reasonably safe and careful manner." <u>Baxley</u>, 170 So. 2d at 172.

Generally, it is a fact question for the jury whether a particular activity is inherently dangerous. <u>Doak v. Green</u>, 677 So. 2d 301, 302 (Fla. Dist. Ct. App. 1996) (per curiam). The trial court nonetheless may rule that an activity is inherently dangerous as a matter of law if there is "some statute or case law designating the activity as inherently dangerous," or if there is a "sufficient record

of undisputed facts" upon which the decision can be based.  Id.  Indeed, Florida courts often have held that particular activities are inherently dangerous as a matter of law.  See, e.g., Midyette v. Madison, 559 So. 2d 1126, 1128 (Fla. 1990) (holding that clearing of land by fire is inherently dangerous as a matter of law); Bialkowicz v. Pan Am Condominium No. 3, Inc., 215 So. 2d 767, 772 (Fla. Dist. Ct. App. 1968) (holding that installation of support pilings is inherently dangerous as a matter of law).

Applying these standards to the present case, we conclude that the district court had a sufficient basis for concluding that transport of the combustion turbine was inherently dangerous as a matter of law.  The court's extensive analysis points to several undisputed facts that warrant this conclusion.  The district court noted that the combustion turbine itself was tremendous in size, constituting an 82-ton, 14-foot high, 14-foot wide, and 57-foot long piece of machinery.  The vehicle used to transport the 82-ton turbine itself weighed over 290,000 pounds.  The transport vehicle, in fact, was an 184-foot, specially-equipped hauler consisting of a road tractor and a hauler rig that contained three separate cargo decks.  The vehicle was over three times the length of an ordinary 18 wheeler.  As further evidence of the oversized nature of the turbine and the transport vehicle, the hauler rig had to be equipped with special hydraulic equipment to adjust to gradations in the road.

In addition to the unique dimensions and weight of the combustion turbine and the transport vehicle, the district court pointed to the quantum of regulations dealing with the transport of oversized items like the turbine as indicative of the inherent dangerousness involved. The court noted that Florida strictly regulates the transportation of oversized items like the turbine, see Florida Statute § 316.550, and that state law specifically addresses the moving of heavy equipment across railroad crossings. See § 316.170. The court also pointed out that the Florida Department of Transportation, the City of Tampa, and Polk County all required special permits before the turbine could be transported.

As further evidence of inherent dangerousness, the district court focused on the unique preparation and the special precautions that were taken in transporting the combustion turbine. For instance, GE and S&S used a special "transportation broker" to arrange for the transport of the turbine on a specially-equipped vehicle. Unique measures then had to be taken by Rountree before it could transport the turbine; for instance, it had to coordinate and use special signs, lights, and escort vehicles, all of which the permitting authorities mandated. A separate utility vehicle, moreover, had to clear signs, traffic lights, overhead wires, and other obstacles as the transport of the turbine took place. Two off-duty Florida Highway Patrol officers in marked vehicles also were present to facilitate the transport.

34

All of these factors, when taken together, provide ample justification for the district court's conclusion on the inherent dangerousness issue. It is true that Florida precedent shows that towing of a piece of equipment is not in itself inherently dangerous. See E.J. Strickland Constr., Inc. v. Department of Agric. & Consumer Servs. of Florida, 515 So. 2d 1331, 1335 (Fla. Dist. Ct. App. 1987) (towing of tractor not inherently dangerous); American Auto. Assoc., Inc. v. Tehrani, 508 So. 2d 365, 371 (Fla. Dist. Ct. App. 1987) (operation of wrecker truck not inherently dangerous). But the situation in the present case was drastically different from the average towing scenario, as evidenced by the extraordinary dimensions and weight of the combustion turbine and the transport vehicle.

Furthermore, as the district court explained, transportation of an oversized item like the turbine is strictly regulated by Florida law, and such regulation was one of the primary reasons the Florida Supreme Court held that the clearing of land by fire is inherently dangerous. See Midyette, 559 So. 2d at 1128. Finally, we point out that the use of special hydraulics on the hauler rig to raise or lower its height makes this case similar to the operation of a crane, which Florida courts, on numerous occasions, have held is an inherently dangerous activity. See Scott & Jobalia Constr. Co. v. Halifax Paving, Inc., 538 So. 2d 76, 79-80 (Fla. Dist. Ct. App. 1989); Atlantic Coast Dev. Corp. v. Napoleon Steel Contractors, Inc., 385 So.

35

2d 676, 679 (Fla. Dist. Ct. App. 1980).

　　　b.  The Collateral Negligence Issue

Even if the district court properly concluded that transport of the turbine was inherently dangerous, the I.D. Appellants argue that the court nevertheless erred in its vicarious liability determination because the damage in this case resulted from Rountree's "collateral" negligence.  The I.D. Appellants claim that, even when an owner, contractor, or employer has a nondelegable duty, such a party "is not vicariously responsible for *all* torts committed by the independent contractor." U.S. Security Servs. Corp. v. Ramada Inn, Inc., 665 So. 2d 268, 271 (Fla. Dist. Ct. App. 1996) (per curiam).  They further contend that, based on the Restatement (Second) of Torts § 416, an owner, contractor, or employer can be held vicariously liable only if the independent contractor fails to take the special precautions that need to be taken as a result of the inherent dangerousness of the activity involved.[15] Conversely, the I.D. Appellants maintain that such parties cannot be held vicariously liable for the independent contractor's negligence that is collateral to

---

[15]The section states in full:
> One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise.

Restatement (Second) of Torts § 416 (1965).

36

the risks inherent in the activity, such as "abnormal or unusual kinds of negligence on the part of the contractor, or negligence in the performance of operative details of the work which ordinarily may be expected to be carried out with proper care." Restatement (Second) of Torts § 426 cmt. b (1965);[16] see also Security Servs., 665 So. 2d at 271.

Based on these principles, the I.D. Appellants' position is that, even if transport of the turbine constituted inherently dangerous work, evidence presented at the liability trial[17] shows that Rountree was collaterally negligent because its crew failed to take routine, common-sense precautions in attempting to transport the combustion turbine across the railroad crossing. They assert that the Rountree crew committed ordinary negligence by choosing to disable the transport vehicle

---

[16]The comment states in full:
> The employer is required to contemplate, and to be responsible for, the negligence of the contractor with respect to all risks which are inherent in the normal and usual manner of doing the work under the particular circumstances. He is not required to contemplate or anticipate abnormal or unusual kinds of negligence on the part of the contractor, or negligence in the performance of operative details of the work which ordinarily may be expected to be carried out with proper care, unless the circumstances under which the work is done give him warning of some special reason to take precautions, or some special risk of harm to others inherent in the work.

Restatement (Second) § 426 cmt. b (1965).

[17] At oral argument, there was some confusion over whether the transcripts of the liability trial had been filed with our court and whether any of the parties had been denied access to the transcripts in composing their appellate briefs. In a joint letter from counsel dated 14 December 2001, the parties explained that the liability trial transcripts had been filed. We therefore have a complete record before us in deciding the inherent dangerousness issue. The parties also stated in their joint brief that no counsel of any party was claiming that he or she was denied use of the transcripts in preparing their appellate briefs.

37

on the train tracks at the railroad crossing instead of moving the vehicle off the tracks first, even though the crew knew that an Amtrak train was due to pass. The Rountree crew did not fail to take special precautions related to transport of the oversized combustion turbine and transport vehicle, in the I.D. Appellants' view. Rather, from their viewpoint, the crew acted with extreme recklessness, failing to take the precautions that any ordinary driver would take at a railroad crossing. Under these circumstances, the I.D. Appellants maintain, they should not be held vicariously liable for Rountree's negligent acts or omissions.[18]

We reject the position of the I.D. Appellants because, as the district court properly held, Rountree's failure to move the transport vehicle from the railroad crossing was a function of the unique dangers that arose in transporting an oversized piece of machinery like the combustion turbine. The basic characteristics of the massive transport vehicle are not in dispute. The vehicle had 13 axles and 8 articulations, or pivot points. It required two drivers, one at the

---

[18]The collateral negligence issue was raised in the appellate briefs of GE and Rountree, but not in AHA's brief. As a result, the Rail Companies argue that, even if we were to determine that Rountree acted with collateral negligence, they should not be bound by this determination on waiver grounds. The Rail Companies are appellees with respect to the appeal by AHA over its damages award. They are not involved in the separate cross appeal over the indemnification agreement between KUA and GE, the context within which the collateral negligence issue was raised. Since AHA, within the context of its own appeal, did not raise the collateral negligence issue, the Rail Companies contend that AHA should be deemed to have waived that defense with regard to them. Because we conclude that the district court acted correctly in holding that Rountree was not collaterally negligent, we need not resolve the waiver issue.

front of the vehicle, and one at the back.  The vehicle, moreover, was equipped with a special hydraulic system that could raise or lower the cargo beds to adjust to gradations in road terrain.  If gradations in the terrain were too great, the cargo beds could then be raised further through "shimming," the insertion of metal pieces into certain crevices in the vehicle.  R124-814.  Before the crew could shim the load, the vehicle had to be set down on pine blocks, resulting in only a few inches of clearance between the vehicle and the road surface.

The basic facts leading up to the collision also are not in dispute.[19]  On the collision date, the transport vehicle arrived at the private road grade crossing in the late morning.  The Rountree crew first attempted to turn the transport vehicle left

---

[19]The district court's order and memorandum on the inherently dangerous work issue, as well as the appellate briefs filed in this case, did not make clear precisely how the transport vehicle became immobilized on the tracks.  Indeed, the appellate briefs did not reference any specific testimony during the fourteen-day liability trial concerning whether the transport vehicle became stuck on the tracks, or whether the vehicle instead was disabled on the tracks by the Rountree crew.  Furthermore, if the Rountree crew had disabled the vehicle on the tracks, the appellate briefs did not make clear the crew's rationale (or lack thereof) for doing so.  Since resolution of this question would aid us in resolving the collateral negligence issue, we asked the parties to address the following questions in letter brief form:

> Where in the transcript of the two-week liability trial (cite to volume, page, and line) is there testimony concerning whether the hauler rig was stuck on the railroad grade crossing when the collision occurred, or whether the crew had purposefully disabled it there after determining that the rig could not clear the crest in the road?  If the latter occurred, was there any testimony that addressed whether the crew, having determined that the rig could not clear the crest, had sufficient time to remove the rig from the crossing prior to the collision?

Order to File Supplement Briefs (January 17, 2002).

The letter briefs filed in response enabled us to obtain a better picture of how the collision occurred and of what issues were in dispute. We have incorporated this information into the description of events leading up to the collision.

onto the crossing, but a utility pole prevented this maneuver. The Rountree crew then turned the vehicle around and approached the railroad crossing from the opposite direction in order to make a right-handed turn. Before proceeding forward over the railroad crossing, James Garren, the project supervisor, and Ralph Shook, the rear driver of the transport vehicle, inspected the elevation of the crossing. To do so, Garren and Shook stood on opposite ends of the track. Garren kneeled and "eye-balled" how far the crest of the crossing extended up Shook's leg. R122-1779. Garren and Shook then used a tape measure to determine the distance from the ground to the point on Shook's leg to which the crest extended. They concluded that the vehicle would clear the crest of the crossing, if the vehicle was elevated to its maximum height using the hydraulic system.

After raising the height, the Rountree crew attempted to maneuver the transport vehicle over the railroad crossing. The crew shortly realized, however, that even with the height of the vehicle fully extended by the hydraulic system, the cargo beds would not clear the crest of the crossing. Consequently, the crew stopped the vehicle on the tracks, even though members of the crew had heard that an Amtrak train was due to pass the railroad crossing by 1:00 p.m. Instead of backing the transport vehicle completely off the crossing, the crew disabled the vehicle on the tracks in order to implement the shimming procedure, which would

40

raise the height of the vehicle enough to clear the crossing. The crew did so at the direction of Garren, who believed that the vehicle could be removed from the tracks more quickly if the crew set down the vehicle on the tracks to shim the load than if they first attempted to maneuver it backwards off the crossing. Garren feared that if the crew tried to back the vehicle completely off the crossing, it would jack knife and would get stuck there. The crew proceeded to shim the load with the transport vehicle on the tracks. After completing the shimming procedure, but before the vehicle had time to proceed forward over the crossing, an Amtrak train arrived and the collision occurred.

At the liability trial, the dispute over whether Rountree was negligent focused primarily on the decision to shim the load with the transport vehicle still on the tracks. The parties presented conflicting accounts of whether the transport vehicle could have been backed off the crossing in a quick and safe manner. Additionally, the parties disputed whether the Rountree crew followed a reasonable procedure in measuring the crest of the crossing before trying to proceed with the vehicle over the tracks. That is, they argued over whether the Garren and Shook acted unreasonably by eye-balling the railroad crossing elevation instead of using a more scientific, precise method of measurement.

That the dispute concerned these particular acts or omissions of the Rountree

crew shows that, contrary to the I.D. Appellants' position, the present case is not about collateral negligence. This conclusion follows from the fact that the risk that the Rountree crew would err over whether and how to maneuver backwards the enormous transport vehicle — with its 13 axles and 8 pivot points — is exactly the type of dangerous risk inherent to the moving of oversized machinery in a low-clearance, specialized transport vehicle. That a supervisor like Garren might miscalculate whether the specialized vehicle would jack knife and get stuck is one of the dangers inherent to the operation of a 184-foot vehicle hauling an 82-ton piece of machinery. Moreover, that Garren and Shook would measure the height of the crest improperly is one of the dangers that flows directly from utilization of a low-clearance vehicle with a specially-equipped hydraulic unit for raising or lowering cargo beds in response to terrain elevation. We therefore agree with the district court that Rountree's negligence resulted from its failure to take the special precautions required for transporting an oversized combustion turbine in a complex, specially-equipped vehicle that was sensitive to changes in terrain gradation levels. The factual disputes in this case only reinforce this conclusion.

### c. The Vicariously Liable Parties

The I.D. Appellants raise one final argument. They contend that even if transport of the turbine was inherently dangerous, and even if Rountree did not

42

commit collateral negligence, S&S should not be held vicariously liable for Rountree's negligent acts or omissions.[20]   The I.D. Appellants contend that Rountree's employer, WOKO, can be held vicariously liable for Rountree's negligence, but not S&S, who hired WOKO but had no direct employment or contractual relationship with Rountree.  The issue here is whether a principal (S&S) can be liable for the conduct of its contractor's (WOKO's)  subcontractor (Rountree).  We agree with the district court on this issue and conclude that, under the facts of this case, S&S can be held vicariously liable for Rountree's negligence.

The parties do not dispute that S&S, through its contract with GE, was responsible for transporting the combustion turbine to the Plant.  By contracting with GE, S&S assumed the duty of providing for the safe transport of the turbine. As part of its contractual duties, S&S arranged for the inherently dangerous activity of having the turbine transported in a specially-equipped vehicle.  Because transport of the turbine constituted inherently dangerous work, the duty of S&S to provide for the safe transport of the turbine was nondelegable.  See Baxley, 521

---

[20]The I.D. Appellants apparently have decided not to challenge the district court's decision that GE was vicariously liable for Rountree's negligence.  The I.D. Appellants therefore have waived their right to appeal the district court's vicarious liability determination as regards GE.  In any event, the same rationale we apply to uphold the court's decision as to the vicarious liability of S&S would apply equally to its decision with regard to GE, who had a nondelegable duty to transport the turbine safely to the Plant as a result of its Purchasing Agreement with KUA.

43

So. 2d at 172 (stating that anyone "engaged in or responsible for" the inherently dangerous activity has a nondelegable duty). When a duty is nondelegable, "responsibility, i.e., ultimate liability, for the proper performance of that undertaking may not be delegated." Atlantic Coast, 385 So. 2d at 679. Thus, as the district court concluded, S&S remained ultimately liable for the transport of the turbine, even though it had contracted with WOKO to arrange for the transportation.

   3.  Comparative Fault

Even if transport of the combustion turbine was inherently dangerous as a matter of law, AHA argues that the district court nevertheless should not have limited its recovery to 41% of its damages. As subrogee of S&S, AHA claims that, because S&S was only vicariously liable for the collision, the district court erred in applying Florida comparative fault principles, as enunciated in Florida Statute § 768.81, to reduce the proven damages. AHA contends that § 768.81 applies solely to parties who are directly negligent, and that a party who is only vicariously liable cannot have fault apportioned to him under § 768.81. This issue has not been directly addressed by the Supreme Court of Florida. Because this issue involves unsettled questions of state law that raise important public policy concerns, we

44

have decided to certify the issue to Florida's highest court for resolution.

As previously noted, at the conclusion of AHA's presentation of evidence in the damages trial, KUA and FMPA,[21] among others (collectively, the "C.F. Appellees"), orally moved for the court to enter judgment as a matter of law in favor of AHA and against Rountree and the Rail Companies in the amount of $1,851,822.40, which represented 41% of $4,546,640. The district court granted the motion. The court ruled that the subrogee AHA could recover only 41% of the damages that it had proven were incurred by S&S because Rountree's fault (59%) was to be apportioned to S&S, and hence to AHA, under Florida Statute § 768.81. Rountree's fault was apportioned to the subrogee AHA under § 768.81 because S&S had been held vicariously liable for, and thus had been imputed with, Rountree's negligence under the inherently dangerous work doctrine. Not only was S&S legally obligated to pay damages owed by Rountree to the collision victims, but also, through AHA, it was to have its own damages for loss of the combustion turbine and of the enclosure reduced under § 768.81 in proportion to Rountree's negligence. Upon reaching this conclusion regarding the application of § 768.81, the district court, having ruled already that Rountree's liability to AHA

---

[21]KUA and FMPA enjoyed an identity of interest with the Rail Companies over the damages awarded to AHA because the district court previously had held that KUA and FMPA had to indemnify the Rail Companies. We discuss in detail the indemnification agreement between KUA and CSX in section II.C.

was limited to $1,000,000,[22] entered judgment against the Rail Companies jointly and severally for the remaining $851,822.40.

In discussing the district court's conclusion, we turn first to Florida Statute § 768.81, entitled "Comparative Fault." The section states that "any contributory fault chargeable to the claimant diminishes proportionally the amount awarded as economic . . . damages for an injury attributable to the claimant's contributory fault." Fla. Stat. Ann. § 768.81(2) (West 1997).[23] The section further provides that "[t]he court shall enter judgment against each party liable on the basis of such party's percentage of fault and not on the basis of the doctrine of joint and several liability." § 768.81(3).

AHA's primary assertion is that the district court improperly treated vicarious liability as synonymous with the word "fault" in § 768.81, given that "fault," in AHA's view, means direct negligence. To substantiate its position, AHA points to Florida cases that treat vicarious liability as a matter of status or relationship, not of fault. See Nash v. Wells Fargo Guard Servs., Inc., 678 So. 2d

_____

[22]AHA does not challenge the district court's determination that it could recover no more than $1,000,000 from Rountree.

[23] In its appellate brief, AHA references Florida Statutes Annotated § 768.81 (West 1997) as the version of the section applicable to this case. This version was last amended in 1992, before the turbine collision occurred. The Florida legislature amended § 768.81 in 1999, before the damages trial over AHA's damages took place. See Fla. Stat. Ann. § 768.81 (West Supp. 2002). FMPA argues that the 1999 version of the section should apply. The 1999 amendments, however, did not change the substantive language quoted in the paragraph above.

1262, 1264 (Fla. 1996) ("We . . . hold that the named defendant cannot rely on the vicarious liability of a nonparty to establish the nonparty's fault."); Mercury Motors Express, Inc. v. Smith, 393 So. 2d 545, 549  (Fla. 1981) ("An employer is vicariously liable . . . [for] the negligent acts of employees committed within the scope of their employment even if the employer is *without fault*.  This is based upon the long-recognized public policy that victims . . . should be compensated even though it means placing vicarious liability on an *innocent* employer.") (emphasis added); Crowell v. Clay Hyder Trucking Lines, Inc., 700 So. 2d 120, 125 (Fla. Dist. Ct. App. 1997) ("Vicarious liability awards compensate for injuries without regard to fault.").  AHA also notes that in this case, the district court specifically stated that S&S is an "innocent part[y] who [i]s vicariously liable for damages which are wholly the fault of Rountree."  R100-1979-22 n.17.

As a consequence of such case law, AHA concludes that when Florida Statute § 768.81(3) states that damages are to be apportioned based on a party's "percentage of fault," it means based on a party's direct negligence, not on a party's status or relationship with another party.  Fla. Stat. Ann. § 768.81(3); see also Fabre v. Marin, 623 So. 2d 1182, 1185 (Fla. 1993), overruled in part on other grounds, Wells v. Tallahassee Mem'l Reg'l Med. Ctr., Inc., 659 So. 2d 249 (Fla. 1995) ("We conclude that [§ 768.81] is unambiguous.  By its clear terms, judgment

47

should be entered against each party liable on the basis of *that* party's percentage of fault.") (emphasis added).  Indeed, AHA indicates that at least one Florida appellate panel has interpreted Fabre as equating fault under Florida Statute § 768.81 with direct negligence.  See Wal-Mart Stores, Inc. v. McDonald, 676 So. 2d 12, 20 (Fla. Dist. Ct. App. 1996), aff'd sub nom., Merrill Crossing Assocs. v. McDonald, 705 So. 2d 560 (Fla. 1997) (stating that, in addressing § 768.81, the Fabre court "equated a defendant's fault with the amount of its negligence") (quotations omitted).  The essence of AHA's contention, therefore, is both that Florida law consistently has drawn a sharp distinction between vicarious liability and fault, and that this same distinction should be recognized in the application of Florida Statute § 768.81, which refers only to fault and never specifically mentions vicarious liability.

Additional arguments can be made in favor of AHA's position.  AHA claims that a vicariously liable party cannot be said to have contributed to, or to have participated in, the accident at issue in a given torts case.  But the Fabre court stated that apportionment of damages under § 768.81 is between "*participants* to the accident."  Fabre, 623 So. 2d at 1185 (emphasis added).  Furthermore, one can argue that a vicariously liable party is not a joint or concurrent tortfeasor, given that such a party is being held liable solely for the conduct of another.  Some

48

Florida cases, however, have indicated that § 768.81 only applies to joint or concurrent tortfeasors. See D'Amario v. Ford Motor Co., __ So. 2d __ (Fla. November 21, 2001) (No. SC95881, SC96139) (per curiam) (holding that, in a crashworthiness case between a car accident victim and an automobile manufacturer, the third-party driver responsible for the initial collision cannot have fault apportioned to him under § 768.81 because the third-party driver and manufacturer are not joint or concurrent tortfeasors ); Association for Retarded Citizens-Volusia, Inc. v. Fletcher, 741 So. 2d 520, 524-25 (Fla. Dist. Ct. App. 1999) (stating that, in an action between an injured party and an initial tortfeasor, a health care provider who aggravates the initial injury cannot have fault apportioned to him under § 768.81 because the physician and initial tortfeasor are successive, rather than joint, tortfeasors).

In sum, AHA's assertion is that a party who is only vicariously liable cannot have another's fault apportioned to him under § 768.81, which AHA argues only applies to parties who are directly negligent, who actively participate in the accident at issue, or who constitute joint or concurrent tortfeasors. The subrogee AHA therefore contends that it should be able to recover all of the damages that it had proven were incurred by S&S without having Rountree's negligence apportioned to it under § 768.81. This interpretation of § 768.81 would not harm

49

the C.F. Appellees, AHA maintains, because they still could recover their damages from S&S as a result of S&S's vicarious liability for Rountree's negligence. Moreover, irrespective of the outcome here, AHA points out that, should Rountree seek to recover its own damages from the C.F. Appellees, Rountree still would be required to have its damages reduced under § 768.81 as a result of its direct negligence in causing the turbine collision.

The C.F. Appellees raise several rebuttal arguments. They too focus on the precise wording of § 768.81. The C.F. Appellees note that under § 768.81(2), any contributory fault that is "*chargeable* to the claimant" has the effect of diminishing his or her damages "for an injury *attributable* to the claimant's contributory fault." Fla. Stat. Ann. § 768.81(2) (emphasis added); see also Cody v. Kernaghan, 682 So. 2d 1147, 1149 (Fla. Dist. Ct. App. 1996) (noting that the doctrine of contributory fault applies " to reduce . . . economic . . . damages by the percentage of fault which can be attributed to the plaintiff"). Terms like "chargeable" and "attributable," in the view of the C.F. Appellees, indicate that the meaning of "fault" for purposes of § 768.81 goes beyond direct negligence. Furthermore, § 768.81(4)(b) lists several situations where comparative fault does not apply, such as where liability is "based upon an intentional tort," but the list does not include situations where liability is based upon vicarious liability. Fla. Stat. Ann. §

50

768.81(4)(b). Based on this statutory language, the C.F. Appellees have a basis for arguing that the district court did not overreach by treating S&S's vicarious liability as within the ambit of the term "fault" found in § 768.81.

In addition to arguing that their position synchronizes with the statutory language of § 768.81, the C.F. Appellees claim that their position, unlike that of AHA, accords with baseline tort principles, as pronounced in Restatement (Third) of Torts: Apportionment of Liability § 5. Section 5 states that "[t]he negligence of another person is imputed to a plaintiff whenever the negligence of the other person would have been imputed had the plaintiff been a defendant." Restatement (Third) of Torts: Apportionment of Liability § 5 (1999). In turn, comment b of the Restatement section states that "[w]hen a party would be responsible as a defendant for the negligence of a third person, the negligence of the third person is imputed to the party as a plaintiff." Id. § 5 cmt. b. The C.F. Appellees argue that, since the vicariously liable S&S would be charged with Rountree's negligence if S&S were the defendant, thus causing S&S to bear legal responsibility for any damages owed by Rountree to collision victims, it follows that Rountree's negligence should be charged to S&S in this action where S&S, through AHA, is the plaintiff.

Finally, the C.F. Appellees turn to distinguishing the cases relied on by

AHA, including Fabre, Nash, and Walmart. They contend that Fabre only held that in enacting § 768.81, the Florida legislature intended for all joint or concurrent tortfeasors who cause an accident to be included in the apportionment of fault for that accident, even those tortfeasors who are non-parties to the suit. Fabre, 623 So. 2d at 1185. Fabre never indicated that fault under § 768.81 can only mean direct negligence, the C.F. Appellees assert. Similarly, they maintain that Nash stands for the proposition that it is inappropriate for a named defendant to include a non-party on the verdict form for apportionment of damages, if the non-party is only vicariously liable for the named defendant's negligence. Nash, 678 So. 2d at 1264-65. Otherwise, the C.F. Appellees note, the plaintiff's recovery against the named defendant would be unfairly split between two parties — the named active tortfeasor and the vicariously liable non-party — even though the liability of the two should be coextensive under basis principles of joint and several liability. The C.F. Appellees' argument is that the Nash holding has nothing to do with whether a party to an action, vicariously liable for another's negligence, can be imputed with the active tortfeasor's negligence for purposes of reducing its own damages recovery. Finally, the C.F. Appellees point out that Walmart held that a non-party intentional tortfeasor should not be included on the verdict form for purposes of apportioning fault under § 768.81. Walmart, 676 So. 2d at 16-23. They claim that

52

Walmart is not relevant to the vicarious liability context because the case focuses exclusively on the interaction between intentional torts and comparative fault.

Unfortunately, there is no easy method for resolving the conflicting interpretations of § 768.81 and of Florida precedent provided by AHA and the C.F. Appellees. In our effort to resolve this conflict, we did locate two additional Florida appellate decisions that deal with vicarious liability and comparative fault, but on close analysis, neither resolves the issue raised here. In J.R. Brooks & Son, Inc. v. Quiroz, the Florida appellate court stated that when the named defendant's "liability for the accident was purely vicarious in nature . . . it is obvious, contrary to the ruling below, that the comparative fault statute, section 768.81 . . . do[es] not apply." 707 So. 2d 861, 863 (Fla. Dist. Ct. App. 1998). Brooks, however, held only that a vicariously liable party is entitled to a complete set off as to settlement amounts paid to the plaintiff by the active tortfeasor. Id. The case was about the interaction between Florida set-off statutes and § 768.81, a different subject than the one addressed in the present litigation. We therefore are hesitant to interpret broadly the language of the opinion concerning the interaction between vicarious liability and § 768.81.

Similarly, in Suarez v. Gonzalez, a case where the defendant was vicariously liable for another's negligence, the Florida appellate court stated that "[t]his is not

53

a situation where there were joint tortfeasors, so the comparative fault statute and Fabre do not apply." __ So. 2d __, __ (Fla. Dist. Ct. App. January 2, 2002) (No. 4D01-671). The case, however, was the flip-side of Nash. The appellate court held that a non-party active tortfeasor should not be included on the verdict form when a party defendant, who was vicariously liable for the non-party's negligence, already was included on that form. Id. Otherwise, like in Nash, the plaintiff's recovery against the named defendant would be unfairly split between two parties even though the liability of the two should be coextensive. As with Brooks, we refrain from broadly analogizing Suarez to the present case. It therefore is clear that existing Florida case law does not resolve the question of how § 768.81 is to be interpreted with regard to vicarious liability. Both sides in the present case have good arguments for their respective interpretations of § 768.81, and the issue is one upon which reasonable persons can disagree.

Having concluded that the comparative fault issue raised here involves an unanswered question of Florida law that is not specifically addressed by controlling state precedent, we certify the following question of law to the Supreme Court of Florida for instructions:

> SHOULD A VICARIOUSLY LIABLE PARTY HAVE THE NEGLIGENCE OF THE ACTIVE TORTFEASOR APPORTIONED TO IT UNDER FLORIDA STATUTE § 768.81 SUCH THAT RECOVERY OF ITS OWN DAMAGES IS REDUCED CONCOMITANTLY?

54

If the Florida Supreme Court decides to accept this certification, we note that the phrasing of the question is not meant to limit, in any way, how the court responds to the question or analyzes the state law issues involved therein.[24]

### 4. Prejudgment Interest

After ruling that AHA could recover 41% of its proven damages, the district court denied AHA's request for prejudgment interest on its damages award. AHA argues that the court erred in this regard. We review the district court's decision on whether to award prejudgment interest for abuse of discretion. Insurance Co. of

---

[24]As we already noted, the parties dispute which version of Florida Statute § 768.81 applies to this case. If the Florida Supreme Court decides that a vicariously liable party should have the active tortfeasor's fault apportioned to it under § 768.81, then it is clear under both versions of the section that the Rail Companies cannot be held jointly and severally liable for AHA's damages. See Fla. Stat. Ann. § 768.81(3) (West 1997); § 768.81(3)(c) (West Supp. 2002). That is, the fault of S&S (59%), and hence of AHA, would be greater than that of either CSX (33%) or Amtrak (8%), in which case the Rail Companies cannot be held jointly and severally liable for AHA's damages

Yet, if the Florida Supreme Court decides that the active tortfeasor's fault should *not* be apportioned to the vicariously liable party, the outcome differs under the two versions of the section. Under the earlier version cited by AHA, "with respect to any party whose percentage of fault equals or exceeds that of a particular claimant, the court shall enter judgment with respect to economic damages against that party on the basis of the doctrine of joint and several liability." Fla. Stat. Ann. § 768.81(3) (West 1997). Under this version, both of the Rail Companies would be jointly and severally liable for AHA's damages because the direct negligence of CSX (33%) and Amtrak (8%) would exceed the direct negligence of S&S (0%), and therefore of AHA. Yet, under the later version of § 768.81 that FMPA argues should apply, "[a]ny defendant found 10 percent or less at fault shall not be subject to joint and several liability." § 768.81(3)(b)(1) (West Supp. 2002). Amtrak thus would not be jointly and severally liable for CSX's damages under this later version of the section. We refrain from resolving which version of the section should apply, however, until the Florida Supreme Court has addressed our certified question. Otherwise, we would run the risk that our decision on the issue would become moot, in the event that the Florida Supreme Court decides that a vicariously liable party should be apportioned the active tortfeasor's negligence under § 768.81.

North America v. M/V Ocean Lynx, 901 F.2d 934, 942 (11th Cir. 1990).

Under Florida law,[25] "tort claims are generally excepted from the rule allowing prejudgment interest, primarily because tort damages are generally too speculative to liquidate before final judgment." Lumbermens Mut. Cas. Co. v. Percefull, 653 So. 2d 389, 390 (Fla. 1995). Florida law, moreover, does not permit a prejudgment interest award unless there is "an ascertainable out-of-pocket loss occurring at a specific time prior to the entry of the judgment." Underhill Fancy Veal, Inc. v. Padot, 677 So. 2d 1378, 1380 (Fla. Dist. Ct. App. 1996).

Applying these principles to the present case, we hold that the district court acted within its discretion in not awarding prejudgment interest. As section II.A.1 of our opinion indicates, the amount of loss incurred by S&S was unclear and was a matter of bitter dispute during the damages trial. There was no easily ascertainable, out-of-pocket amount that AHA could point to as a dispositive

---

[25] FMPA argues that federal law should apply on the issue of prejudgment interest because federal question jurisdiction is proper in this case. It is true that, because Amtrak is a federally chartered corporation that meets the requirements of 28 U.S.C. § 1349, federal question jurisdiction is proper. See The Pacific Railroad Removal Cases, 115 U.S. 1, 11, 5 S.Ct. 1113, 1118 (1885); Osborn v. Bank of the United States, 22 U.S. (9 Wheat.) 738, 817-28 (1824). If the federal law at issue provides no substantive standards for the allowance of prejudgment interest, however, we can use state law as a reference point for purposes "of convenience and practicality." United States ex rel. Georgia Elec. Supply Co. v. United States Fidelity & Guar. Co., 656 F.2d 993, 997 (5th Cir. Unit B Sept. 1981). This is especially true here, where Florida law has been applied throughout this litigation and where the statute at issue, 28 U.S.C. § 1349, does not contain any substantive legal content.

measure of S&S's loss. It follows the district court did not err in treating the damages incurred by S&S as unascertainable and speculative before the time of final judgment, and thus in refusing to grant prejudgment interest to AHA.

B.  Indemnification Agreement between KUA and GE

We turn next to the appeal by KUA, FMPA, and B&V (collectively, the "Indemnitee Appellants") of the district court's denial of their motions for summary judgment on the issue of whether, under the indemnification provision in the Purchasing Agreement,  GE had to reimburse the Indemnitee Appellants for the expenses they suffered in defending themselves.  In denying their motions, the district court ruled that, as a matter of law, the attorney's fees and costs the Indemnitee Appellants incurred were not within the scope of the indemnification agreement between KUA and GE.

As we have noted, KUA contracted with GE for purchase and delivery of the customized turbine equipment.  The Purchasing Agreement between KUA and GE included the following provision entitled "Indemnification":

> [T]he Contractor [GE] shall *defend, indemnify, and hold harmless* the Owner [KUA] and its officers, directors, commissioners, agents and employees, and the Engineer [B&V] and its partners from and against all liability, claims, damages, losses and expenses, including reasonable attorney['s] fee[s], resulting from . . . injury to or death of persons (including employees of Owner, Engineer and Contractor) or physical damage to or physical loss of property of third parties *to the extent of and on account of any negligent act or omission of Contractor in performing the work under*

57

*the Contract. . . .*

R104-2060 Exh. A at GC.29 (emphasis added).[26]  Based on this language, the Indemnitee Appellants moved for summary judgment, arguing that GE had to reimburse them for attorney's fees and costs incurred in successfully defending themselves against liability.

In rejecting their motion, the district court relied primarily on two Florida cases, Houdaille Industries, Inc. v. Edwards, 374 So. 2d 490 (Fla. 1979), and SEFC Building Corp. v. McCloskey Window Cleaning, Inc., 645 So. 2d 1116 (Fla. Dist. Ct. App. 1994).  The court found the present case factually indistinguishable from Houdaille and SEFC Building, both of which state that the indemnitor does not have to indemnify the indemnitee unless the indemnitee is found to be without fault.  See Houdaille, 374 So. 2d at 492-93; SEFC Bldg., 645 So. 2d at 1117.  That is, both cases provide that, under Florida law, one party has to indemnify another only if the latter's liability is founded on the former's wrongdoing, not on its own. Id.; SEFC Bldg., 645 So. 2d at 1117.  The only time a party can be indemnified for its own wrongful acts is if the indemnity contract "express[es] such an intent in clear and unequivocal terms."  SEFC Bldg., 645 So. 2d at 1117.

_____

[26]The indemnification provision does not specifically mention FMPA.  Because the district court ruled that the expenses incurred by the Indemnitee Appellants did not fall within the contours of the provision, the court did not reach the question of whether FMPA was covered by the indemnification agreement between KUA and GE.

Based primarily on these cases, the district court denied the summary judgment motions and held as a matter of law that the Indemnitee Appellants could not obtain attorney's fees and costs under the indemnification provision. The court noted that, if the Indemnitee Appellants had been held liable at trial, it would have been due to their own negligence, not that of GE. This is because, the district court maintained, it had been established that the Indemnitee Appellants could not be held vicariously liable for GE's acts or omissions. Based on Houidaille and SEFC Building, the court concluded that none of the Indemnitee Appellants would have been entitled to indemnification had they been held liable for the claims brought against them.[27] Since the Indemnitee Appellants would not have been entitled to indemnification from GE had they been held liable, the court decided that the Indemnitee Appellants were not entitled to recover attorney's fees and costs in defending themselves against such liability.

We review de novo the district court's decision concerning a motion for summary judgment, applying the same standard as the district court. Mitchell v. USBI Co., 186 F.3d 1352, 1354 (11th Cir. 1999). A district court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and

---

[27]At the liability trial, the jury had determined that Rountree was 59% at fault for the collision, CSX was 33% at fault, and Amtrak was 8% at fault. The Indemnitee Appellants had been cleared of any liability for the turbine collision.

59

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) (2001).

The Indemnitee Appellants raise several arguments as to why the district court erred by failing to grant them reimbursement for attorney's fees and costs. Their best argument, however, is that the district court failed to consider Florida cases like Florida Department of Transportation v. Southern Bell Telephone & Telegraph Co., 635 So. 2d 74, 78 (Fla. Dist. Ct. App. 1994), and J.A. Jones Construction Co. v. Zack Co., 232 So. 2d 447, 450 (Fla. Dist. Ct. App. 1970), which address indemnification agreements that specifically state that the indemnitor has to "defend" the indemnitee. The Indemnitee Appellants point out that the indemnification provision in the Purchasing Agreement states not only that GE shall "indemnify[] and hold harmless" KUA and others, but also that GE shall "defend" these parties. R104-2060 Exh. A at GC.29. The Indemnitee Appellants assert that the district court failed to consider the duty to defend created by the contractual language and the case law associated therewith. Instead, the court primarily relied on Houidaille and SEFC Building, cases that do not involve indemnity provisions containing a duty to defend.

Florida precedent distinguishes between two duties in the contractual

60

indemnification context: (1) the duty to indemnify and hold harmless the indemnitee, and (2) the duty to defend the indemnitee. See Southern Bell, 635 So. 2d at 78 (noting that the "duty to defend is entirely separate from [the] right to indemnification"); J.A. Jones, 232 So. 2d at 450 (same). The duty to defend is triggered based on "the nature of the claim" alleged against the indemnitee, "regardless of whether the party asserting the claim should win or lose upon a final determination of the suit." J.A. Jones, 232 So. 2d at 450; see also Southern Bell, 635 So. 2d at 78. The indemnitor must defend the indemnitee if the underlying facts contained in the complaint can be fairly read to support a claim covered by the indemnification provision. Metropolitan Dade County v. CBM Indus. of Minnesota, Inc., 776 So. 2d 937, 938 (Fla. Dist. Ct. App. 2001). If the lawsuit involves "a covered claim and a claim which is not covered by the indemnity agreement, then the duty to defend extends to the entire lawsuit." Metropolitan Dade County v. Florida Aviation Fueling Co., 578 So. 2d 296, 298 (Fla. Dist. Ct. App. 1991) (per curiam).

The Indemnitee Appellants contend that the district court should have followed the methodology of duty-to-defend cases like CBM Industries and hence should have focused solely on whether any of the claims brought against the Indemnitee Appellants were covered by the indemnification provision. They argue

that, under cases such as <u>Florida Aviation</u>, so long as one of the claims alleged was that the Indemnitee Appellants were vicariously liable for GE's negligence, this was enough to trigger GE's duty to defend them against all claims raised in the litigation. The district court, however, did not focus on whether such claims had been raised against the Indemnitee Appellants; instead, the court focused on whether such claims would be successful, concluding that "none of [the three] parties can be held vicariously or constructively liable for GE's negligence." R104-2086-8.

Had the indemnification provision in the Purchasing Agreement stated that GE had to defend the Indemnitee Appellants and went no further, we would agree with the Indemnitee Appellants' argument. It is clear that the district court did not follow the methodology commonly employed by Florida courts in the duty-to-defend context, where the focus is on the claims raised against the indemnitee, not on the ultimate success of such claims. See <u>CBM Indus.</u>, 776 So. 2d at 938; <u>J.A. Jones</u>, 232 So. 2d at 450. Nevertheless, we agree with the result reached by the district court because the plain language of the indemnification provision in the Purchasing Agreement trumps the rules that would otherwise apply in the duty-to-defend context.

Contract interpretation normally raises questions of law for the court to

resolve.  DEC Elec., Inc. v. Raphael Constr. Corp., 558 So. 2d 427, 428 (Fla. 1990).  In interpreting an indemnity agreement, courts are to look to "the logical meaning and intent of the contract."  Misener Marine Constr. Co. v. Southport Marine, Inc., 377 So. 2d 757, 758 (Fla. Dist. Ct. App. 1979).  In so doing, courts are to remember that "[w]ords in an instrument should be given their natural or most commonly understood meaning."  Tropabest Foods, Inc. v. Florida Dep't of Gen. Servs., 493 So. 2d 50, 51-52 (Fla. Dist. Ct. App. 1986).

The indemnification provision here states that GE has to pay the damages, losses, and expenses (including attorney's fees) of the Indemnitee Appellants only "*to the extent of and on account of* any negligent act or omission of Contractor [GE] in performing the work under the Contract."  R104-2060 Exh. A at GC.29 (emphasis added).  It does *not* provide, in a manner similar to some indemnity agreements, that GE must make such payments for damages, losses, or expenses that *may* arise out of a negligent act or omission of GE.  Cf.  CBM Indus., 776 So. 2d at 938.  Rather, the wording here is much closer to the indemnity agreement at issue in Westinghouse Electric Corp. v. Prudential Insurance Co. of America, the language of which limited the indemnitor's payment of claims and expenses to situations where "liability [was] imposed by law."  547 So. 2d 721, 721 (Fla. Dist. Ct. App. 1989).  Consequently, we conclude that the "to the extent of and on

account of" language indicates that any payment of attorney's fees or other expenses is limited to situations where GE itself has been found negligent. Because the district court held as a matter of law that GE was free of direct negligence for the collision, GE is not required to reimburse the Indemnitee Appellants for their attorney's fees or other expenses incurred in defending themselves.

In response to this interpretation of the indemnification provision, the Indemnitee Appellants argue that the phrase "negligent act or omission" in the provision means either direct negligent or vicarious liability. Since GE was held vicariously liable for Rountree's transport of the turbine, the Indemnitee Appellants contend that any contractual condition placed on the payment of attorney's fees or expenses has been met. We disagree with the Indemnitee Appellants' argument because the word "negligent" contained in the indemnification provision cannot be read to encompass vicarious liability without unnaturally expanding its meaning.

Florida law provides that negligence occurs when a person, by some act or omission, "fail[s] to use reasonable care." Moransais v. Heathman, 744 So. 2d 973, 976 n.4 (Fla. 1999). In contrast, vicarious liability involves "[t]he imposition of liability on one person for the actionable conduct of another, based solely on a

relationship between the two persons." Blacks Law Dictionary 1566 (6th ed. 1990). In other words, a person is held negligent based on his or her own failure to exercise reasonable care, but a person is held vicariously liable based on another's failure to exercise reasonable care. It follows that the words "negligent" and "vicarious liability" are not interchangeable because, in terms of liability, the latter is a more expansive concept than the former. Had the parties instead meant for both terms to apply to the provision, they could have chosen a word like "liability" instead of "negligent." Furthermore, even if the word "negligent" was ambiguous as to whether it included vicarious liability, "[i]n construing an indemnity provision not given by one in the insurance business but given as an incident to a contract . . . the indemnity provision must be construed strictly in favor of the indemnitor." Westinghouse Elec., 547 So. 2d at 722. Any ambiguity in the word "negligent" thus should be construed in favor of GE to exclude vicarious liability from its scope.

In sum, the indemnification provision in the Purchasing Agreement placed upon GE both a duty to indemnify and hold harmless and a duty to defend. The district court failed to consider Florida precedent that addresses the duty to defend, instead focusing solely on precedent that addresses the contractual duty to indemnify and hold harmless. The district court, however, reached the correct

65

result because the plain language of the indemnification provision trumped the rules that otherwise would apply in the duty-to-defend context. More specifically, the provision required that GE be held directly negligent for the collision before it could be required to reimburse the other parties for their attorney's fees or other legal expenses incurred in defending themselves. Because the district court concluded that, as a matter of law, GE was not negligent, the Indemnitee Appellants are not entitled to reimbursement for their attorney's fees and costs. Accordingly, we affirm on the indemnification issue because we can do so "as long as the judgment entered is correct on any legal ground regardless of the grounds addressed, adopted, or rejected by the district court." Ochran v. United States, 273 F.3d 1315, 1318 (11th Cir. 2001) (quotations omitted).

C. Indemnification Agreement between KUA and CSX

As previously mentioned, KUA entered into the Crossing Agreement with CSX to ensure that there would be vehicular and pedestrian access to the Plant. Under the Crossing Agreement, CSX granted KUA a license to construct, use, and maintain a private road grade crossing across CSX's railroad tracks. Section 14 of the Crossing Agreement, entitled "RISK, LIABILITY, INDEMNITY," addresses KUA's duty to defend and indemnify CSX in return for receiving the license. Section 14.1 states:

66

Licensee [KUA], recognizing that Railroad's [CSX's] operations and any use of Railroad property, tracks and right-of-way involves increased risks, expressly assumes all risk of loss and damage to, and waives any right to ask or demand for, Property of Licensee, or any part thereof, at the Crossing including loss of or interference with the use of service thereof, regardless of cause. . . .

R53-1172 Exh. A at 14.1. Section 14.2 further provides that KUA "assumes all liability for, and releases and agrees to defend, indemnify, protect and save Railroad harmless from and against [designated losses and casualties] regardless of cause, even if occurring or resulting from the sole or joint fault, failure or negligence of Railroad." Id. at 14.2. In addition, the Crossing Agreement requires that KUA not only defend and indemnify CSX, but also "any other company . . . whose property at [the crossing] may be leased or operated by the undersigned Railroad," as well as "any parent, subsidiary or affiliated system companies of Railroad." Id. at 1.2.

Based on the indemnification provision found in the Crossing Agreement, the Rail Companies moved for summary judgment and asked the district court to rule as a matter of law that KUA had to indemnify them against all property loss or damage they incurred as a result of the collision. They also asked the court to rule that KUA had to defend them against all claims for property damage or personal injury in the turbine litigation, and to rule that KUA had to indemnify them against any liability incurred as a result of such claims. The court granted summary

67

judgment in favor of CSX but denied Amtrak's motion because material issues of fact remained in dispute. Later, after the liability trial, the district court granted Amtrak's renewed motion for summary judgment, holding that KUA had to defend and indemnify Amtrak to the same extent that it had to defend and indemnify CSX because the Amtrak train constituted property that was "operated by" CSX at the time of the collision. See id. at 1.2.

On appeal, KUA and FMPA[28] (collectively, the "Utility Appellants") present several arguments as to why we should reverse the district court's grant of summary judgment to the Rail Companies. The Utility Appellants' first assertion is that the indemnity provision is void and unenforceable because, absent specific legislative authority, KUA could not waive its sovereign immunity beyond what was authorized by Florida Statute § 768.28.[29] They also contend that the indemnity provision is void and unenforceable under Florida Statute § 725.06 because its terms failed to meet the requirements for such provisions when contained in "construction" contracts. Additionally, the Utility Appellants maintain that due to the indemnity provision, the Crossing Agreement constituted

---

[28]For an explanation as to why FMPA is required to defend and indemnify the Rail Companies if KUA is required to do so, see supra note 4.

[29]The State of Florida filed an amicus curiae brief in support of the Utility Appellants on the sovereign immunity issue.

an exculpatory, or adhesion, contract and that, for this reason, there was a question of fact for the jury as to whether CSX possessed a superior bargaining position in the execution of the Crossing Agreement. They argue, moreover, that the indemnity provision is inapplicable under the facts of this case because the negligent actions of CSX occurred in a location separate and apart from the railroad crossing. Finally, the Utility Appellants contend that the district court erred in ruling that Amtrak was a beneficiary of the indemnity agreement between KUA and CSX.

We need not address all of the Utility Appellants' arguments at this time. As we shall explain, the state sovereign immunity issue raised by the Utility Appellants has not been directly resolved by the Supreme Court of Florida. The issue involves unsettled questions of state law that raise important public policy concerns, and so we have decided that, like the comparative fault issue raised in this case, it should be certified to Florida's highest court for resolution. Since the Florida Supreme Court's decision on the state sovereign immunity issue might be dispositive of the Crossing Agreement dispute, we refrain from addressing the Utility Appellants' other arguments challenging the indemnity provision until the Florida Supreme Court has spoken.

Under Florida law, the baseline norm is that sovereign immunity applies to

actions where the state is a party, but "[p]rovision may be made by general law for bringing suit against the state as to all liabilities now existing or hereafter originating." Florida Const. art. X, § 13. Only the Florida Legislature has authority to enact a general law that waives the state's immunity. Manatee County v. Longboat Key, 365 So. 2d 143, 147 (Fla. 1978). In the torts context, the Florida Legislature has authorized a limited waiver of state sovereign immunity through the enactment of Florida Statute § 768.28, which provides in part that:

> Actions at law against the state or any of its agencies or subdivisions to recover damages in tort for money damages against the state or its agencies or subdivisions for injury or loss of property, personal injury, or death caused by the negligent or wrongful act or omission of any employee of the agency or subdivision while acting within the scope of his office or employment under circumstances in which the state or such agency or subdivision, if a private person, would be liable to the claimant, in accordance with the general laws of this state, may be prosecuted subject to the limitations specified in this act. . . .

Fla. Stat. Ann. § 768.28(1) (West 1997).[30] Section 768.28(5) further provides that state liability is limited to $100,000 per claimant and $200,000 per accident, unless the Florida Legislature enacts legislation to pay a particular claim in whole or in part. In contrast, the Supreme Court of Florida has held the limitations imposed by § 768.29 do not apply in actions brought against the state for breach of contract.

---

[30]Section 768.28 subsequently has been amended. See Fla. Stat. Ann. § 768.28 (West Supp. 2002). The substantive language of the section that is important in this case, however, has not been changed.

<u>Pan-Am Tobacco Corp. v. Department of Corrections</u>, 471 So. 2d 4, 5 (Fla. 1984).

Based on these sovereign immunity principles, the Utility Appellants argue that the indemnification agreement between KUA and CSX waived state sovereign immunity in tort beyond the limits imposed by § 768.28.[31] The indemnification provision does not limit the amount KUA has to pay out per claimant and per accident, as specified in § 768.28(5). Nor does the provision limit payment by KUA to situations where the property loss or personal injury is caused by a negligent act or omission committed by one of its employees. <u>See</u> § 768.28(1).

In contrast, the indemnity provision does require KUA to defend and indemnify CSX against *all* claims and liability for property damage or personal injury "connected in any manner with the construction, reconstruction, maintenance, existence, use, condition, repair, change, relocation or subsequent removal of [the] Crossing." R53-1172 Exh. A at 14.2(C). Indeed, in the present case, the Rail Companies seek reimbursement even though KUA was cleared of all negligence for the collision, and even though the Rail Companies never had to defend against a claim that they were vicariously liable for negligent misconduct by KUA. Thus, the Utility Appellants contend, the terms of the indemnification provision go far beyond what is authorized by Florida Statute § 768.28. They

---

[31]The parties do not dispute that the Utility Appellants are agencies of the state for sovereign immunity purposes.

maintain that, as a result, we should not give effect to the terms of the indemnification provision.  See Evanston Ins. Co. v. Homestead, 563 So. 2d 755, 758. (Fla. Dist. Ct. App. 1990) (per curiam) ("A contract may not give validity to an illegal act, notwithstanding upon whom the hardship should fall").

There is case law that appears to support the Utility Appellants' position. For instance, in Evanston, a Florida city bought an excess professional liability insurance policy that provided coverage to the city for tort claims that exceeded $500,000.  If the insurance company settled a claim, the policy required the city to reimburse the  company for the retained limit, $500,000.  The insurance company settled a medical malpractice claim against the city for $2,700,000 and sought reimbursement of $500,000.  The city refused, instead agreeing to reimburse the company only for $200,000, the maximum waiver of sovereign immunity allowed under § 768.28.  The insurance company brought suit, alleging that § 768.28 did not apply because the suit was for breach of contract.  The Florida court disagreed, holding that the insurance contract could not be used to circumvent the limits of § 768.28.  Evanston, 563 So. 2d at 757-58.  Similarly, in Seaboard Air Line Railroad Co. v. Sarasota-Fruitville Drainage District, the Fifth Circuit held that an unlimited indemnity agreement between a Florida drainage district and a railroad was void as against public policy because the district could not be compelled to do through an

72

indemnification contract what it could not be compelled to do in a torts damages suit. 255 F.2d 622, 623-24 (5th Cir. 1958).

Based on cases like Sarasota-Fruitville, the argument goes, an indemnification agreement between a state agency and a private company, like the one between KUA and CSX, cannot be used to circumvent the dictates of § 768.28. That is, KUA should not be compelled, based on an indemnification agreement, to pay out funds that it could not be compelled to pay out in a torts damages suit. This assertion is buttressed by another case, Donisi v. Trout, 415 So. 2d 730 (Fla. Dist. Ct. App. 1981). In Donisis, the state appellate court held that an indemnification agreement between a city and its employee was void in so far as it required the city to reimburse the employee in an amount that exceeded the limits imposed by § 768.28. 415 So. 2d at 730-31.

The Utility Appellants also point to several opinions by the Attorney General of the State of Florida to solidify their position.[32] They argue that these opinions demonstrate that a state agency is prohibited from entering into an indemnity agreement if it fails to comply with the limits imposed by § 768.28 — like the agreement entered into between KUA and CSX — unless the agency is

---

[32] "Although an opinion of the [Florida] Attorney General is not binding on a court, it is entitled to careful consideration and generally should be regarded as highly persuasive" on matters of Florida law. Florida v. Family Bank of Hallandale, 623 So. 2d 474, 478 (Fla. 1993).

otherwise authorized to do so by the Florida Legislature.  For instance, in Opinion 2000-22, the Florida Attorney General concluded that no state law authorized a county to enter into an indemnification agreement that increased the limits of liability beyond what § 768.28 allows.  Fla. Op. Att'y Gen. 2000-22 (April 4, 2000).  Similarly, in Opinion 90-21, the Attorney General concluded that the Department of Corrections did not have statutory authority to enter into an indemnity agreement with a private company that circumvented the limitations imposed by § 768.28.  Fla. Op. Att'y Gen. 90-21 (March 20, 1990); see also Fla. Op. Att'y Gen. 95-12 (February 9, 1995) (stating that no statute authorized the Department of Health and Rehabilitative Services to agree by contract to indemnify another governmental entity in a manner that altered the state's immunity under § 768.28).

In rebuttal to these arguments, the Rail Companies assert that the Utility Appellants cannot rely on § 768.28 because it only governs torts actions.  In Provident Management Corp. v. Treasure Island, the Florida Supreme Court stated that § 768.28 "applies only when the government entity is being sued in tort" and when the "damages . . . flow from . . . tortious conduct."  796 So. 2d 481, 486 (Fla. 2001).  In contrast, the Rail Companies contend, the present case involves a suit for breach of contract, namely, the failure by KUA to fulfill its contractual obligation

to defend and hold harmless the Rail Companies.  Breach of contract claims, the Rail Companies claim, are governed by the rule enunciated in Pan-Am.  In Pan-Am, the Florida Supreme Court stated that "[i]n section 768.28 . . . the legislature has explicitly waived sovereign immunity in tort.  There is no analogous waiver in contract.  Nonetheless, the legislature has, by general law, explicitly empowered various state agencies to enter into contracts."  471 So. 2d at 5.  The court then went on to hold that "where the state has entered into a contract fairly authorized by the powers granted by general law," sovereign immunity does not apply to the breach of contract action.  Id.

According to the Rail Companies, Pan-Am indicates that, as long as KUA was fairly authorized by general law to enter into contracts like the Crossing Agreement, sovereign immunity does not protect KUA from the breach of its contractual duty to defend and indemnify the Rail Companies.  To show that KUA was fairly authorized to enter into the Crossing Agreement, the Rail Companies point to several provisions of Florida law:  (1) the powers given municipalities under article VIII, § 2(b) of the Florida Constitution; (2) the Municipal Home Rule Powers Act, Florida Statute § 166.021; (3) the Florida Interlocal Cooperation Act, Florida Statute § 163.01; and (4) the Joint Power Act, Florida Statute §§ 361.10-361.18.

The Rail Companies' argument is buttressed by the fact that the cases that appear to support the Utility Appellants' position can be distinguished. Evanston, for instance, failed to address Pan-Am and failed to discuss how the latter decision might affect the sovereign immunity analysis contained therein. Moreover, Donisi was decided prior to Pan-Am, as was Sarasota-Fruitville. Furthermore, in contrast to such cases, the Rail Companies point to a Florida case, Jacksonville v. Franco, where the court upheld an indemnification agreement between a city and a private railroad because the "clear and unequivocal language" of the contract put the city on notice of its contractual obligations. 361 So. 2d 209, 211 (Fla. Dist. Ct. App. 1978) (quotations omitted).

The Rail Companies also contrast the Fifth Circuit decision in Sarasota-Fruitville with Seaboard Air Line Railroad Co. v. Crisp, where the Fifth Circuit held that a Georgia county could not assert a sovereign immunity defense when it had entered into a license with a private railroad under which the county assumed liability for damage occasioned to a railroad embankment. 280 F.2d 873, 877 (5th Cir. 1960). The county had entered into the license as part of its efforts to build a hydroelectric dam. The Fifth Circuit distinguished the case from Sarasota-Fruitville and concluded that, because operation of the dam was a business operation, the county should be treated like any other business that breaches a

contract, thus rendering sovereign immunity inapplicable. Id. Similarly, the Rail

Companies argue that operation of the Plant by the Utility Appellants is itself a

business operation, and so the Utility Appellants should be treated like any other

business that breaches a contract.

In addition, the Rail Companies respond to the Utility Appellants' citation

to opinions of the Florida Attorney General. The Rail Companies argue that these

opinions are misleading because the Attorney General, in issuing his opinions, has

applied a stricter standard than that provided for in Pan-Am. They maintain that

the Attorney General has erroneously failed to apply Pan-Am and has instead

concluded that state agencies have no authority to enter into indemnification

agreements that exceed the dictates of § 768.28, unless a Florida statute

specifically indicates otherwise. In contrast, the Rail Companies contend that Pan-

Am makes clear that an indemnification agreement between a state agency and

private party is binding and enforceable as long as it is part and parcel of a contract

that itself was "fairly authorized" by Florida law. 471 So. 2d at 5.

Finally, the Rail Companies argue that, even if Pan-Am does not apply and

§768.28 controls, the Utility Appellants did not violate § 768.28 by entering into

the indemnification agreement.[33] The Rail Companies note that § 768.28(18)

---

[33]The Rail Companies also contend that, even if the indemnification provision in the
Crossing Agreement is invalid, the Utility Appellants should not be heard to so complain

specifically provides that when state agencies contract with one another, "[s]uch a contract must not contain any provision that requires one party to indemnify or insure the other party for the other party's negligence or to assume any liability for the other party's negligence." Fla. Stat. Ann. § 768.28(18). By negative implication, they assert, § 768.28 authorizes state agencies to agree by contract to defend and indemnify *private parties* as they so choose. In any event, the Rail Companies contend that the Florida Interlocal Cooperation Act, Florida Statute § 163.01(15)(k),[34] exempts the Utility Appellants from the limitations of § 768.28.

In reply to the arguments of the Rail Companies, the Utility Appellants

---

because the doctrine of estoppel applies in this case. We will address this argument, if need be, after the Florida Supreme Court speaks to the sovereign immunity issue raised in this case.

[34]The provision states in part:
The limitations on waiver in the provisions of s. 768.28 or any other law to the contrary notwithstanding, the Legislature, in accordance with s. 13, Art. X of the State Constitution, hereby declares that any such legal entity or any public agency of this state that participates in any electric project waives its sovereign immunity to:
. . . .
>2. Any person in any manner contracting with a legal entity of which any such public agency is a member, with relation to:
>a. Ownership, operation, or any other activity set forth in sub-subparagraph (b)2.d. with relation to any electric project; or
>b. The supplying or puchasing of services, output, capacity, energy, or any combination thereof.

Fla. Stat. Ann. § 163.01(15)(k) (West 1997). The Florida Interlocal Cooperation Act subsequently has been amended. See Fla. Stat. Ann. § 163.01 (West Supp. 2002). The substantive language at issue here, however, has not been changed.
KUA and FMPA entered into a Participation Agreement to facilitate construction of the Plant. As KUA acknowledges in its Motion to Correct Misstatement of Fact Contained in the Reply Brief, this agreement was entered into pursuant to the authority granted by § 163.01. The Florida Interlocal Cooperation Act therefore is relevant to this case. The Utility Appellants, however, dispute the meaning attached to § 163.01(15)(k) by the Rail Companies.

argue that <u>Pan-Am</u> is irrelevant to the present case and that § 768.28 applies. They claim that there is a distinction between contracts in which a state agency offers to pay for goods or services, and indemnification contracts, where the agency agrees to assume the tort liability of a private party. <u>Pan-Am</u>, the Utility Appellants maintain, was limited to situations where a state agency breaches a contract to pay for goods or services from a private party. Furthermore, they assert that, even if <u>Pan-Am</u> does apply, KUA was not "fairly authorized" under any Florida statute to enter into the species of contract at issue here, namely, an indemnification contract in which it assumed the tort liability of a private party. 471 So. 2d at 5. In contrast, other state agencies explicitly have been given the authority to enter into indemnification agreements. <u>See</u> Florida Statute § 161.101(4) (authorizing the Department of Environmental Protection to enter into indemnification agreements to effectuate beach erosion control); § 255.559(1) (authorizing state agencies to enter into indemnification agreements with asbestos consultants).

Upon reviewing all of these arguments, we have concluded that there is no clear answer, based on Florida precedent, for resolving this sovereign immunity dispute and the important public policy concerns associated therewith. It is an unsettled question whether the indemnification agreement entered into between KUA and CSX is controlled by § 768.28. It also is unsettled whether the

agreement should be governed by the sovereign immunity rule for breach-of-contract actions, as laid down in Pan-Am. Indemnification agreements appear to occupy a grey area between two lines of Florida precedent that address state sovereign immunity, one of which deals with torts actions, the other with breach-of-contract actions. Moreover, even if Pan-Am applies, it is unclear, under existing Florida precedent, if KUA loses its sovereign immunity protection only if it had statutory authority to enter into the particular species of contract at issue here, an indemnification contract, or if KUA loses such protection as long as it had general statutory authority to contract with private parties.

Concluding that the sovereign immunity issues raised in this case involve unanswered questions of Florida law that are not specifically addressed by controlling state precedent, we certify the following three questions of law to the Supreme Court of Florida for review:

> GIVEN THAT KISSIMMEE UTILITY AUTHORITY, A MUNICIPAL AGENCY UNDER FLORIDA LAW, AGREED BY CONTRACT TO INDEMNIFY A PRIVATE PARTY, IS THE AGREEMENT CONTROLLED BY THE RESTRICTIONS ON WAIVER OF SOVEREIGN IMMUNITY FOUND IN FLORIDA STATUTE § 768.28?

> IS THE INDEMNIFICATION AGREEMENT INSTEAD CONTROLLED BY THE RULE FOR BREACH-OF-CONTRACT ACTIONS ENUNCIATED IN PAN-AM TOBACCO CORP. V. DEPARTMENT OF CORRECTIONS, 471 So. 2d 4 (Fla. 1985)?

> IF PAN-AM APPLIES, DOES A MUNICIPAL AGENCY LIKE

80

KISSIMMEE UTILITY AUTHORITY LOSE THE PROTECTION OF SOVEREIGN IMMUNITY ONLY IF IT HAS SPECIFIC STATUTORY AUTHORIZATION TO ENTER INTO INDEMNIFICATION AGREEMENTS, OR IS IT SUFFICIENT THAT THE AGENCY MORE GENERALLY HAS STATUTORY AUTHORIZATION TO CONTRACT WITH PRIVATE PARTIES?

Our phrasing of the certified questions is not meant to limit, in any way, how the Florida Supreme Court responds to the questions or analyzes the state law issues involved therein, should the court decide to accept this certification.

## III. CONCLUSION

These consolidated appeals ensued after the district court issued its final judgment respecting a 1993 incident in which an Amtrak passenger train collided with a hauler rig that was transporting a combustion turbine and turbine enclosure. On appeal, AHA challenged several district court's rulings that affected its damages award. With respect to AHA's arguments, we have ruled that the district court correctly restricted the evidence AHA, as subrogee of S&S, could introduce to prove the damages incurred by S&S, and we have ruled that the court correctly directed a verdict as to the amount of damages AHA had proven. We also have determined that the court properly held that transport of the combustion turbine was inherently dangerous as a matter of Florida law, and that AHA was not entitled to prejudgment interest. We have decided, however, to certify one of the issues raised by AHA to the Florida Supreme Court for review. The issue concerns the

81

interrelationship between vicarious liability and comparative fault under Florida Statute § 768.81. Additionally, we have heard the appeals filed by KUA, FMPA, and B&V concerning the district court's ruling that GE did not have to defend and indemnify them, and we have affirmed that ruling. Finally, we have considered the appeals of KUA and FMPA challenging the district court's holding that they had to defend and indemnify CSX and Amtrak. Because of the important issues of state law sovereign immunity raised by KUA and FMPA, we have certified three questions to the Florida Supreme Court for resolution. To assist in the consideration of all four questions that have been certified herein, we direct the Clerk of the Court to transmit this certificate, as well as the entire record and the briefs of the parties, to the Florida Supreme Court. Until such time as the Florida Supreme Court responds to our certified questions, all further proceedings in these consolidated appeals are STAYED.

**AFFIRMED IN PART AND QUESTIONS CERTIFIED.**